IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

FILED
U.S. DISTRICT COURT

2005 APR 15 P 1: 42

DISTRICT OF UTAH

BY:
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br>        vs.<br><br><br>HIPOLITO LOPEZ, PEDRO LUIS<br>LOPEZ, PABLO DE JESUS<br>MARTINEZ-INIGUES, JOSE ABEL<br>CARRANZA-MARTINEZ, MAURILIO<br>ECHEVARRIA-VAZQUEZ, HECTOR<br>MANUEL ERENAS-FRANCO, ARMANDO<br>FAUDOA, JOSE JUAN RODRIGUEZ,<br>GABRIEL LEON ROYBAL, FERNANDO<br>RUESGA, ANA MARINA SANCHEZ,<br>FRANCISCO SAUCEDO, JAIME<br>VARGAS, MARIO ZAMORA-NUNEZ,<br>VINCENTE COMPAGNA,<br><br>    Defendants. | **REPORT AND RECOMMENDATION**<br>**AND ORDER**<br><br><br>Case No. 2:03-CR-476 DB |

    This criminal action was brought against Defendants Hipolito

Lopez, Pedro Luis Lopez, Pablo de Jesus Martinez-Inigues, Jose

Abel Carranza-Martinez, Maurilio Echevarria-Vazquez, Hector

Manuel Erenas-Franco, Armando Faudoa, Jose Juan Rodriguez,

Gabriel Leon Roybal, Fernando Ruesga, Ana Marina Sanchez,

Francisco Saucedo, Jaime Vargas, Mario Zamora-Nunez, and Vincente

Compagna.  Before the court are three sets of motions to suppress

1



filed by various defendants.  First are motions to suppress evidence gathered through wiretap interceptions from orders issued by California state courts.  Second are motions to suppress evidence gathered through wiretap interceptions from orders issued by this court.  Third is a motion filed by Echevarria to suppress evidence obtained from searches of his residence and business.

After thoroughly reviewing and considering the parties' pleadings, the court recommends that all of Defendants' motions to suppress be denied.

## FACTUAL BACKGROUND

### A.  The California Wiretaps

While the Drug Enforcement Administration (hereafter referred to as "DEA") and California law enforcement officials were investigating two known drug trafficking organizations, the DEA and California law enforcement realized that someone was repeatedly communicating with those organizations from (909) 906-0254 (hereafter referred to as CA Target Phone #1).  Although investigators did not know the identity of the person calling from this number, the repeated calls between this number and the two known drug cartels strongly indicated that the caller was involved in drug trafficking.

Because investigators knew nothing about the individual using CA Target Phone #1, they argued that it was necessary to obtain a wiretap warrant.  Although investigators had used a

2

confidential informant (hereafter referred to as "CI") in the investigation, their CI knew nothing about the person using CA Target Telephone #1.  Because the phone was registered to a non-existent address, physical surveillance and search warrants were impossible.  Similarly, pen registers were inconclusive because they only provided statistical information that led to false addresses.  Thus, investigators could not identify the person who was speaking into CA Target Telephone #1.  The investigators represented that if they were allowed a wiretap, they would be able to identify key personnel, suppliers, and customers for the trafficking organizations; locations where drugs were hidden; and management and disposition of proceeds from drug sales.

Based on these affirmations, on February 4, 2003, Judge Patrick Magers entered an order captioned "Wire Tap No. 03-02" (hereafter referred to as "CA Order #1"), authorizing the interception of communications occurring over CA Target Phone #1 for a period not to exceed thirty days.  This was the first wiretap order sought in this case.  That wiretap generated records for approximately 966 calls occurring over CA Target Phone #1 between February 5 and March 6, 2003.  Later investigation determined that CA Target Phone #1 was primarily used and carried by Erenas.  The government asserts that only Erenas and Compagna were overheard on CA Target Phone #1, and Defendants have not disputed that assertion.

The wiretap for CA Target Phone #1 revealed that phone belonged to someone known as Hector who worked with people known as Guero, Pancho, Jorge, Daniel, Diego, and Carlitos. These six other people used three other phones to do their business, and repeated calls from these three phones to CA Target Telephone #1 prompted investigators to seek a second wiretap on these three other phones.

Therefore, based on a new affidavit, on March 11, 2003, Judge Magers entered another order captioned "Wire Tap No. 03-04" (hereafter referred to as "CA Order #2"), authorizing the interception of communications occurring over three cellular telephone numbers: (909) 259-1842 (hereafter referred to as "CA Target Phone #2"), (909) 205-0423 (hereafter referred to as "CA Target Phone #3"), and (909) 847-0148 (hereafter referred to as "CA Target Phone #4"). Interception was authorized for a period not to exceed thirty days.

The wiretap for CA Target Phone #2 generated records for approximately 185 calls occurring over that phone between March 11 and March 27, 2003. Later investigation determined that CA Target Phone #2 was primarily used and carried by subject of investigation FNU LNU, a.k.a. David Morales. The government asserts that none of the defendants presently before the court were overheard on CA Target Phone #2, and Defendants have not disputed that assertion.

4

The wiretap for CA Target Phone #3 generated records for approximately 915 calls occurring over that phone between March 11 and April 8, 2003.  Later investigation determined that CA Target Phone #3 was primarily used and carried by Erenas.  The government asserts that of the defendants before the court, only Erenas, Carranza, and Compagna are overheard on CA Target Phone #3, and Defendants have not disputed that assertion.

The wiretap for CA Target Phone #4 generated records for approximately 116 calls occurring over that phone between March 11 and April 9, 2003.  Later investigation determined that CA Target Phone #4 was primarily used and carried by subject of investigation Francisco LNU.  The government asserts that none of the defendants presently before the court are overheard on CA Target Phone #4, and Defendants have not disputed that assertion.

On April 17, 2003, Judge J. Thompson Hanks entered an order captioned "Wire Tap No. 03-06" (hereafter referred to as "CA Order #3"), authorizing the interception of communications occurring over two cellular telephone numbers:  (909) 235-9305 (hereafter referred to as "CA Target Phone #5") and (909) 518-3896 (hereafter referred to as "CA Target Phone #6a").  Interception was authorized for a period not to exceed thirty days.

The wiretap for CA Target Phone #5 generated records for approximately 836 calls occurring over CA Target Phone #5 between April 17 and May 17, 2003.  CA Target Phone #5 was primarily used

and carried by Erenas. The government asserts that of the defendants before the court, only Erenas, Carranza, Compagna, and Pedro Lopez are overheard on CA Target Phone #5, and Defendants have not disputed that assertion.

The wiretap for CA Target Phone #6a generated records for approximately 883 calls occurring over that phone between April 17 and May 17, 2003. Later investigation determined that CA Target Phone #6a was primarily used and carried by Carranza. The government asserts that of the defendants before the court, only Erenas and Carranza are overheard on CA Target Phone #6a, and Defendants have not disputed that assertion.

On June 4, 2003, Judge Magers entered an order captioned "Wire Tap No. 03-07" (hereafter referred to as "CA Order #4"), authorizing the interception of communication occurring over three cellular telephone numbers: (909) 518-3896 (hereafter referred to as "CA Target Phone #6b"), (909) 261-0247 (hereafter referred to as "CA Target Phone #7a"), and (909) 757-3389 (hereafter referred to as "CA Target Phone #8"). Interception was authorized for a period not to exceed thirty days.

The wiretap for CA Target Phone #6b generated records for approximately 353 calls occurring over that phone between June 4 and July 1, 2003. Investigation determined that CA Target Phone #6b was primarily used and carried by Carranza. The government asserts that of the defendants before the court, only Erenas and

Carranza are overheard on CA Target Phone #6b, and Defendants have not disputed that assertion.

The wiretap for CA Target Phone #7a generated records for approximately 1,021 calls occurring over that phone between June 4 and July 3, 2003.  CA Target Phone #7a was primarily used and carried by Erenas.  The government asserts that of the defendants before the court, only Erenas, Compagna, and Carranza are overheard on CA Target Phone #7a, and Defendants have not disputed that assertion.

The wiretap for CA Target Phone #8 generated records for six calls occurring over that phone between June 4 and June 13, 2003. Investigation determined that CA Target Phone #8 was primarily used and carried by Erenas.  The government asserts that no completed calls were monitored or recorded from CA Target Phone #8.  Therefore, the government asserts that none of Defendants are overheard on CA Target Phone #8, and Defendants have not disputed that assertion.

On July 3, 2003, Judge Magers and Judge Gary Paer entered an order captioned "Wire Tap No. 03-08" (hereafter referred to as "CA Order #5"), authorizing the interception of communications occurring over three cellular telephone numbers:  (909) 261-0247 (hereafter referred to as "CA Target Phone #7b"), (909) 415-0134 (hereafter referred to as "CA Target Phone #9"), and (909) 490-2429 (hereafter referred to as "CA Target Phone #10").

Interception was authorized for a period not to exceed thirty days.

The wiretap for CA Target Phone #7b generated records for approximately 486 calls occurring over that phone between July 4 and July 31, 2003.  Investigation determined CA Target Phone #7b was primarily used and carried by Erenas.  The government asserts that of the defendants before the court, only Erenas, Compagna, and Carranza are overheard on CA Target Phone #7b, and Defendants have not disputed that assertion.

The wiretap for CA Target Phone #9 generated records for approximately 445 calls occurring over that phone between July 3 and July 31, 2003.  CA Target Phone #9 was primarily used and carried by Compagna.  The government asserts that of the defendants before the court, only Compagna, Erenas, Hipolito Lopez, Pedro Lopez, and Carranza are overheard on CA Target Phone #9, and Defendants have not disputed that assertion.

The wiretap for CA Target Phone #10 generated records for approximately 773 calls occurring over that phone between July 3 and July 31, 2003.  Investigation determined that CA Target Phone #10 was primarily used and carried by Carranza.  The government asserts that of the defendants before the court, only Carranza, Erenas, and Compagna are overheard on CA Target Phone #10, and Defendants have not disputed that assertion.

### B.   The Utah Wiretaps

Beginning in February 2003, DEA special agents began an active investigation of a drug trafficking organization (hereafter referred to as "DTO") of unknown leadership, centered in Kearns, Utah.  Agents were alerted to the DTO when calls intercepted on the wiretaps in Los Angeles, California showed significant drug trafficking activity occurring over two Utah cellular telephone numbers.  Those two numbers were (801) 414-9220, subscribed to by Hipolito Lopez at 4545 Lander Way, Kearns, Utah, and (801) 414-5736, subscribed to by Pedro Lopez at 793 North 1200 West, Salt Lake City, Utah.

On March 29/30, 2003, calls intercepted over the California wiretaps indicated that a major drug transaction involving ten pounds of methamphetamine was underway.  Surveillance of the California targets disclosed that the purchasers were using a Jeep Grand Cherokee registered in Utah to Armando Faudoa at 793 North 1200 West, Salt Lake City.  Based on the wire intercepts and surveillance, California officers performed a search and seizure of the Cherokee, which disclosed the presence of ten pounds of methamphetamine, hidden in the gas tank.  The individuals in possession of the Cherokee said their address was 4545 Lander Way, Kearns, Utah.

Agents discovered that 4545 Lander Way was owned by Echevarria.  Agents also discovered that Echevarria also was the registered owner of a vehicle used in the delivery of a

9

controlled purchase of four ounces of cocaine in July 2001.  In addition, agents discovered two addresses connected to Echevarria:  3117 South 800 East, Salt Lake City, the billing address for his cellular phone and an address listed as a business; and 4442 Cherryhollow Circle, Sale Lake City, the address on his Utah driver's license.  During April 2003, random surveillance was conducted at these addresses, as well as the other addresses, but officers were unable to observe anything that materially advanced the investigation.

Based on the investigation to that point, on June 3, 2004, United States District Judge Dee Benson issued an order (hereafter referred to as "Utah Order #1") authorizing the interception of communications occurring over two cellular telephone numbers:  (801) 414-9220 (hereafter referred to as "Utah Target Phone #1") and (801) 414-5736 (hereafter referred to as "Utah Target Phone #2").  Utah Target Phone #1 was subscribed to by Hipolito Lopez, and Utah Target Phone #2 was subscribed to by Pedro Lopez.  Interception was authorized for a period of thirty days.  Monitoring of the communications began on June 4 and ended on July 3, 2003, pursuant to the expiration of Judge Benson's order.  During the thirty days' pendency of the wiretaps, hundreds of calls involving drug activity were monitored and recorded.  Many of these calls involved Echevarria.

On July 23, 2003, United States District Judge Dale A. Kimball issued a second wiretap order (hereafter referred to as

10

Utah Order #2) authorizing for a period of up to thirty days the interception of wire communications over the following three cellular telephone numbers:  (801) 688-3417 (hereafter referred to as "Utah Target Phone #3"), (801) 654-0579 (hereafter referred to as "Utah Target Phone #4"), and (801) 759-0340 (hereafter referred to as "Utah Target Phone #5").  Utah Target Phone #3 was used by Hipolito Lopez, Utah Target Phone #4 was used by Pedro Lopez, and Utah Target Phone #5 was used by Vargas. Interceptions pursuant to Utah Order #2 began on July 24, 2003, and ended on July 31, 2003.

### C. The Searches of Echevarria's Residence and Business

Also on July 23, 2003, Special Agent (hereafter referred to as "SA") Mark Bacon applied to Judge Robin Reese of the Utah Third District Court for two search warrants.  One was for Echevarria's residence at 4442 Cherryhollow Circle, Salt Lake City, and the other warrant was for Echevarria's business, an upholstery shop, at 4669 West 3500 South.  Both warrants identified the objects to be seized, the existence of which probable cause was alleged, to be documents related to drug trafficking, including, inter alia, records, notes, and photos. Probable cause was not alleged for actual controlled substances. The warrants were then executed on Echevarria's business and residence.

**PROCEDURAL BACKGROUND**

### A.   Motions to Suppress Evidence Obtained from the Utah Wiretaps

On September 25, 2003, Hipolito Lopez filed a motion to suppress evidence obtained as a result of the Utah wiretaps. (File Entry #107.)  The next day, on September 26, 2003, Martinez filed a separate motion to suppress all evidence derived from the Utah wiretaps.  (File Entry #108.)  On June 7, 2004, Hipolito Lopez filed a memorandum supporting his motion to suppress evidence obtained as a result of the Utah wiretaps, and supporting exhibits.  (File Entries #213, 215.)  On June 9, 2004, Martinez joined in Hipolito Lopez's motion and memorandum.  (File Entry #220.)  Martinez reiterated that joinder on January 13, 2005.  (File Entry #314.)  On June 14, 2004, Vargas filed a motion/memorandum to suppress the evidence derived from the Utah wiretaps.  (File Entry #223.)  Ruesga joined in the memoranda to suppress Utah wiretap evidence filed by his co-defendants on August 26, 2004.  (File Entry #245.)  On September 8, 2004, Hipolito Lopez filed a supplemental response regarding minimization procedures during the Utah wiretaps.  (File Entry #257.)  Pedro Lopez joined in Hipolito Lopez's motion and memorandum on January 12, 2005.  (File Entry #313.)  The next day, Martinez filed a motion joining in Hipolito Lopez's motion to suppress.  (File Entry #314.)  Rodriguez also joined in the motions and memoranda submitted by his co-defendants to suppress

Utah wiretap evidence.[1]  (The Official Transcript of the Oral Arguments on the Motions to Suppress, held March 22, 2005 (hereafter referred to as "3-22-05 Transcript") at 13.)

The government filed a memorandum responding to Defendants' motions to suppress the Utah wiretap evidence on July 2, 2004. (File Entry #232.)  The government filed Notice of Supplemental Discovery Relating to Utah Wiretap Affidavits on February 7, 2005.  (File Entry #331.)

### B. Motion to Suppress Evidence Obtained from the Search of Echevarria's Residence and Business

On June 7, 2004, Echevarria filed a motion to suppress the evidence obtained from the searches of his residence and business.  (File Entry #214.)  On July 2, 2004 the government filed a memorandum responding to File Entry #214.  (File Entry #233.)

### C.  Motions to Suppress Evidence Obtained from the California Wiretaps

On September 9, 2004, Carranza filed a motion to suppress all evidence gathered pursuant to the California wiretaps.  (File Entry #258.)  The next day, on September 10, 2004, notice was

---

[1]Rodriguez never submitted a written motion to suppress. However, his attorney notified the court at oral arguments that a joinder had been filed, but in the wrong name.  (3-22-05 Transcript at 13.)  Mr. Rodriguez's attorney did not provide the court with a filing date, file entry number, or any other information to allow the court to be positive which motion was filed in the wrong name.  In order to err on the side of caution, the court simply considers Rodriguez to also have joined in the motions to suppress filed by his co-defendants.

filed of a Rule 20 transfer of Erenas from the Eastern District of California.  (File Entry #262.)  On September 16, 2004, Hipolito Lopez filed a motion joining in Carranza's motion and memorandum to suppress evidence gathered through the California wiretaps.  (File Entry #268.)  Carranza's motion was also joined by Erenas on October 20, 2004 (File Entry #279) and Pedro Lopez on October 25, 2004 (File Entry #281).  Pedro Lopez reiterated his joinder on January 12, 2005.  (File Entry #313.)

On December 6, 2004, the government filed a memorandum in opposition to the motion to suppress evidence obtained from the California wiretaps.  (File Entry #296.)  On December 13, 2004, the government filed the declaration of SA Janet L. Irwin.  (File Entry #302.)  On January 24, 2005, the government filed a notice regarding its submission of supplemental information on minimization compliance in the California wiretaps.  (File Entry #317.)

On February 23, 2005, Erenas entered a guilty plea.  (File Entries #336, 339.)  Pursuant to that plea, Erenas withdrew his motions to suppress.  (File Entry #341.)

Meanwhile, on October 9, 2003, Judge Benson, to whom the case is assigned, referred the case to United States Magistrate Judge Samuel Alba pursuant to 28 U.S.C. § 636(b)(1)(B).  (File Entry #118.)  The court held several hearings during this time on Defendants' motions to suppress.  (File Entries #130, 140, 207, 244, 273, 325.)  Finally, on March 22, 2005, the court held a

14

hearing where Defendants were given an opportunity to present oral arguments or evidence regarding the three sets of motions to suppress discussed above.  (File Entry #344; Official Transcript of March 22, 2005 Oral Arguments on Motion to Suppress, lodged in file.)  Defendants all declined to present evidence, present oral argument, or in any other way add to their written submissions, whereupon the court took the motions to suppress under advisement.[2]

## LEGAL ANALYSIS

Before the court are (1) motions to suppress evidence obtained pursuant to wiretaps and (2) a motion to suppress evidence obtained during a search of a business and residence. The court first examines the motions to suppress the wiretap evidence.

### I.   Motions to Suppress Evidence Obtained From Wiretaps

Defendants have filed motions to suppress evidence obtained from wiretap orders authorized by California courts and wiretap orders authorized by this court (in Utah).  "[A] district court's

--------

[2]The court notes that on July 18, 2003, Martinez filed a motion to suppress the evidence seized pursuant to the stop of the vehicle he was driving on June 24, 2003.  (File Entry #11.) On September 10, 2003, the government filed a motion to continue the hearing regarding Martinez's motion to suppress until after the motions to suppress the wiretap evidence had been resolved. (File Entry #97.)  This motion was granted because of the interrelationship between the wiretap evidence and the search of the vehicle Martinez was driving on June 24, 2003.

wiretap authorization order is presumed proper, and the defendant
bears the burden of overcoming this presumption." <u>United States
v. Killingsworth</u>, 117 F.3d 1159, 1163 (10th Cir.), <u>cert. denied</u>,
522 U.S. 961 (1997).  An interrelationship exists between the
California and Utah wiretaps.  Specifically, the probable cause
for the wiretaps on the phones of Hipolito Lopez and Pedro Lopez
authorized by Utah Order #1 was derived in part from
interceptions from CA Target Phone #1 (of CA Order #1) and CA
Target Phone #3 (of CA Order #2).  Similarly, information derived
from the wiretaps authorized by Utah Order #1 supplied some of
the probable cause for CA Target Phone #9 (of CA Order #5).
Recognizing this interrelationship, the court first examines the
wiretap orders authorized by California courts, and then examines
the wiretap orders authorized by this Utah court.

### A.   The California Wiretaps

Carranza filed a motion to suppress evidence obtained as a
result of the five wiretaps authorized by California state
courts.  (File Entry #258.)  Carranza argues that the evidence
should be suppressed because (1) the wiretaps were not necessary
and (2) the wiretaps were not properly minimized.

Three other defendants have joined in Carranza's motion to
suppress.  Hipolito Lopez joined in Carranza's motion and
memorandum on September 16, 2004 and Erenas joined on October 20,
2004.  (File Entries #268, #279.)  Pedro Lopez joined on October
25, 2004, and reiterated that joinder on January 12, 2005.  (File

16

Entries #281, #313.)   Therefore, in total, four of the defendants
are parties to the motion to suppress the wiretaps obtained from
California courts:  Carranza, Hipolito Lopez, Erenas, and Pedro
Lopez.

### 1.  Applicable Law

Before proceeding, the court examines which law should be
applied to the court's analysis of Defendants' arguments.  The
California wiretaps were issued by California state courts.
Nevertheless, the California state statute is modeled after the
federal statute.  See People v. Zepeda, 87 Cal. App. 4th 1183,
1195-96 (Cal. Ct. App. 6 Dist.), cert. denied, 534 U.S. 1068
(2001).  In fact, California courts look to federal case law in
interpreting the California wiretap statute.  See People v.
Chavez, 2003 WL 21061360, at *8 (Cal. Ct. App. 4 Dist. 2003)
(unpublished) ("[F]ederal cases construing and applying the
'necessity' requirement are persuasive, if not controlling.").
In such a case, it appears clear that courts should apply federal
law in examining whether to grant a motion to suppress.  See
United States v. Quintana, 70 F.3d 1167, 1169 (10th Cir. 1995)
(explaining that because the Utah wiretap statute is viewed as
substantially identical to the federal statute, the court would
apply federal law in reviewing the admissibility of the wire
interceptions); United States v. Armendariz, 922 F.2d 602, 607
(10th Cir.) (noting that because the state law at issue was
modeled after Title III, the court would apply federal standards

17

to determine whether the evidence derived from the interceptions was admissible), cert. denied, 502 U.S. 823 (1991).

Furthermore, both the defendants and the government cite to federal law to support the arguments in their memoranda.  As a result, this court concludes that federal law should be applied to Defendants' arguments in analyzing whether to suppress the evidence derived from the California wiretaps.

The court next examines which defendants have standing to challenge the California wiretaps.

## 2.  Standing

Only "aggrieved persons" have standing to seek the suppression of evidence obtained from a wiretap.  Aggrieved persons are those people who are either overheard as a result of the wiretap or who own the premises where the overheard conversation took place.  See Alderman v. United States, 394 U.S. 165, 176 (1969).  A person is not an "aggrieved person," and thus does not have standing within the meaning of 18 U.S.C. § 2510(11) with respect to that wiretap, if the person is neither a party to any intercepted communication over the particular phone line nor is "a person against whom the interception was directed," that is, a named interceptee or target.  "[A] person against whom the interception was directed" is a person named as a target in the application, affidavit, and order.  See United States v. Civella, 648 F.2d 1167, 1172 (8th Cir. 1981), cert. denied, 454 U.S. 867 (1981).

With respect to each of the California wiretap orders and target phones, the government asserts that only the following individuals have standing, because they were named as a target in the affidavit, were actually overheard on the wire, or both, as indicated below.  The court's review of the information provided by the government supports this analysis, and Defendants have not contested it.  Therefore, the court concludes that the following list describes those who have standing with regards to each California wiretap:

(1) CA Order #1 and CA Target Phone #1:  Those defendants who have standing to challenge the wiretap of CA Target Phone #1 are Erenas (named target and actual interceptee), Compagna (actual interceptee), and Martinez (actual interceptee).

(2) CA Order #2:

CA Target Phone #2:  Erenas (named target) is the only defendant who has standing to challenge the wiretap on CA Target Phone #2.

CA Target Phone #3:  Erenas (named target and actual interceptee), Carranza (actual interceptee), and Compagna (actual interceptee) are the only defendants who have standing to challenge the wiretap on CA Target Phone #3.

CA Target Phone #4:  Erenas (named target) is the only defendant who has standing to challenge the wiretap on CA Target Phone #4.

(3) CA Order #3:

CA Target Phone #5:  The only defendants who have standing to challenge the wiretap on CA Target Phone #5 are Erenas (named target and actual interceptee), Compagna (named target and actual interceptee), Carranza (named target and actual interceptee), and Pedro Lopez (actual interceptee).

CA Target Phone #6a:  The only defendants who have standing to challenge the wiretap on CA Target Phone #6a are Carranza (named target and actual interceptee), Erenas (named target and actual interceptee), and Compagna (named target).

(4) CA Order #4:

CA Target Phone #6b:  The defendants who have standing to challenge the wiretap on CA Target Phone #6b are Carranza (named target and actual interceptee), Erenas (named target and actual interceptee), and Compagna (named target).

CA Target Phone #7a:  The defendants who have standing to challenge the wiretap on CA Target Phone #7a are Erenas (named target and actual interceptee), Compagna (named target), and Carranza (named target).

CA Target Phone #8:  Erenas (named target) is the only defendant who has standing to challenge the wiretap on CA Target Phone #8.

(5) CA Order #5:

CA Target Phone #7b:  The defendants who have standing to challenge the wiretap on CA Target Phone #7b are Erenas (named

target and actual interceptee), Compagna (named target), and Carranza (named target).

CA Target Phone #9:  The defendants who have standing to challenge the wiretap on CA Target Phone #9 are Erenas (named target and actual interceptee), Compagna (named target and actual interceptee), Carranza (named target and actual interceptee), Hipolito Lopez (actual interceptee), and Pedro Lopez (actual interceptee).

CA Target Phone #10:  The defendants who have standing to challenge the wiretap on CA Target Phone #10 are Erenas (named target and actual interceptee), Compagna (named target and actual interceptee), and Carranza (named target and actual interceptee).

Thus, of the defendants who have filed motions to suppress the California wiretaps, Carranza has standing to challenge CA Order #2 as it relates to CA Target Phone #3, and CA Orders #3, #4, and #5; Erenas has standing to challenge all of the CA Orders; Hipolito Lopez has standing to challenge only CA Order #5 as it relates to CA Target Phone #9; and Pedro Lopez has standing to challenge CA Order #3 as it relates to CA Target Phone #5 and CA Order #5 as it relates to CA Target Phone #9.

The court next turns to Defendants' argument that the California wiretaps were not necessary and therefore the evidence derived from them should be suppressed.

### 3.   Necessity

The statute governing wiretaps contains a "necessity" requirement which is separate and distinct from a "probable cause" requirement.[3]   To comply with the necessity requirement, an application for a wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."   18 U.S.C. § 2518(1)(c).   The judge issuing an authorization order must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."   18 U.S.C. § 2518(3)(c); <u>see also</u> <u>United States v. Castillo-Garcia</u>, 117 F.3d 1179, 1185 (10th Cir. 1997), <u>overruled on other grounds by</u> <u>United States v. Ramirez-Encarnacion</u>, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002).   The necessity requirement serves the purpose of ensuring "'that the relatively intrusive device of wiretapping "is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."'"   <u>Castillo-Garcia</u>, 117 F.3d at 1185 (citations omitted).

Simply because a normal investigative technique is theoretically possible does not mean that it is likely to succeed.   <u>See</u> <u>Castillo-Garcia</u>, 117 F.3d at 1186.   Rather,

---

[3]None of the defendants has argued that the CA Orders lacked probable cause.

"'[w]hat the provision envisions is that the [government's] showing [of necessity] be tested in a practical and commonsense fashion.'" <u>Id.</u> (Citations omitted.)  Therefore, "a court must undertake 'a consideration of all the facts and circumstances' in order to determine whether the government's showing of necessity is sufficient to justify a wiretap." <u>Id.</u> (Citation omitted.)

In addition, the necessity requirement is not an exhaustion requirement.  <u>See id.</u>  "[L]aw enforcement officials are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping." <u>United States v. Edwards</u>, 69 F.3d 419, 429 (10th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1243 (1996) (internal quotation marks and citations omitted).  "Thus, the government may obtain a wiretapping warrant without trying <u>any</u> other methods of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try." <u>Castillo-Garcia</u>, 117 F.3d at 1187; <u>see also</u> 18 U.S.C. §§ 2518(1)(c), 2518(3)(c).

"To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap." <u>Killingsworth</u>, 117 F.3d at 1163; <u>accord Castillo-Garcia</u>, 117 F.3d at 1187.  "If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with

23

particularity why each of such untried techniques would be either unsuccessful or too dangerous." Killingsworth, 117 F.3d at 1163; accord Castillo-Garcia, 117 F.3d at 1187.   Those four techniques are:  "(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants." Killingsworth, 117 F.3d at 1163.   In addition, the government must explain why pen registers or trap and trace devices have not been tried.  See id.; Castillo-Garcia, 117 F.3d at 1187-88. Furthermore, depending on the unique circumstances of each case, the government also may be required to show why other normal investigative techniques have not been tried.  See Killingsworth, 117 F.3d at 1163; Castillo-Garcia, 117 F.3d at 1188.

     "[W]here the government's stated explanation for its use, or failure to use, normal investigative techniques clearly encompasses each of these categories and any other normal investigative techniques that may be applicable to the circumstances, it is not necessary for the government formally to address each category with an explanation."  Castillo-Garcia, 117 F.3d at 1188.  "Thus, the government's failure explicitly to explain its failure to utilize one or more specified categories of normal investigative techniques will not be fatal to its wiretap application if it is clear, under the government's

24

recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." Id.  However, "generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application." Id. "'Instead, [the court] require[s] the government to prove exhaustion--either by attempt or explanation of why the method would not work--of all "reasonable" investigatory methods.'" Id. (Citations omitted.)

Turning to the case before the court, Defendants argue that CA Orders #2-5 were not necessary and that the evidence obtained as a result of the wiretaps authorized by them should be suppressed.  Defendants argue that the government must demonstrate necessity both as to each defendant and as to each wiretap.

The court has examined Defendants' argument that the government must demonstrate necessity as to each defendant and concludes that it lacks merit.  Defendants rely on Castillo-Garcia to support their argument.  In that case, Defendants argue, the court invalidated the warrant because it concluded that "the factors set forth in the First and Second Wiretap applications to establish 'necessity' to wire tap [co-defendants'] telephone numbers d[id] not necessarily establish 'necessity' to wiretap telephone numbers used by the other defendants." Castillo-Garcia, 117 F.3d at 1196.  However, this

conclusion by the Tenth Circuit is not that the government must show necessity as to each defendant; rather, the government in Castillo-Garcia was required to show necessity as to each wiretap.  Therefore, this court need not examine whether necessity was shown as to each defendant.  Instead, the court focuses its analysis on whether necessity was shown as to each wiretap.

This court's rejection of Defendants' interpretation of Castillo-Garcia is supported by other Tenth Circuit cases. First, in United States v. Mitchell, the Tenth Circuit rejected the argument that the government was required to show necessity as to each defendant individually.  See 274 F.3d 1307, 1312 (10th Cir. 2001).  Second, the Tenth Circuit has repeatedly explained that the statute's requirement of necessity must be read in a common sense fashion.  See, e.g., United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir.), cert. denied, 493 U.S. 981 (1989); Castillo-Garcia, 117 F.3d at 1194-95; see also United States v. Arrington, 2000 WL 775576, at *4 (10th Cir. 2000) (unpublished). Requiring the government to show particularized necessity regarding all defendants when many of the defendants are not even known to the investigator at the time of the wiretap application would potentially make it impossible for the government to use wiretaps in appropriate cases.  The Tenth Circuit's ruling in Killingsworth appears to support this interpretation.  In that case, the court concluded that wiretap orders were valid as to

26

defendants who were unnamed in the applications and orders.  <u>See</u>
117 F.3d at 1165.

As a result, the court focuses its analysis on whether
necessity was shown as to the individual wiretaps challenged by
Defendants.  The court next examines each of the wiretap orders
in turn.

### a.   CA Order #2

CA Order #2 authorized the interception of communications
over CA Target Phone #2, CA Target Phone #3, and CA Target Phone
#4.  As set forth above in the court's discussion on standing,
none of Defendants involved in this motion to suppress have
standing to challenge the wiretaps for CA Target Phone #2 and CA
Target Phone #4.[4]  Of those involved in this motion to suppress,
only Carranza has standing to challenge the wiretap to CA Target
Phone #3.  Therefore, with regards to CA Order #2, the court only
examines whether necessity was shown as to CA Target Phone #3.
SA Janet Irwin submitted an affidavit supporting the government's
application for CA Order #2.  Thus, the court examines SA Irwin's
affidavit to determine whether the government showed necessity.

### i.   Surveillance

First, Defendants argue that the government failed to
demonstrate that surveillance was ineffective.  Defendants argue

---

[4]Erenas had standing to challenge all of the CA wiretaps;
however, he withdrew his motions to suppress after entering a
guilty plea, as explained above.

that paragraphs 29-31 of the affidavit described three separate successful stakeouts, and that the government does not make any allegation that the investigators' cover was blown or that the targets ever had any awareness of the surveillance.  Defendants argue that the government did not explain why it could not identify the targets' actual address by following the targets home.

SA Irwin discussed surveillance in paragraphs 28-36 of her affidavit.  As Defendants point out, SA Irwin detailed three specific incidents of surveillance.  However, as the description in the affidavit of these incidents shows, these instances of surveillance were unsuccessful in identifying who "Hector" was or in establishing a known residence for "Hector."  The affidavit explained that the addresses listed on CA Target Phones #3 and #4 did not exist.  The affidavit further explained that without the aid of wire interception, it was difficult to determine whether the targets were simply running errands or whether the targets' actions were narcotics related.  The affidavit explained that greater surveillance would heighten the risk of compromising the investigation, and that the goal of the investigation was not just to identify who "Hector" was, but to identify the complete distribution and profit network for a DTO of great size and reach with evidence to convict the perpetrators.

Defendants also argue that the government documents regarding minimization addressed "to all law enforcement

personnel participating in the monitoring of the conversations"
contains the number 03-04, which corresponds to CA Order #2.
Defendants argue that this document specifically names Carranza
as a target whose conversations may be listened to.  Defendants
explain that although the document is not signed or dated, one
can assume that the document was issued contemporaneously with
the search warrant, and therefore one can conclude that
Carranza's identity was known to investigators at that time.

    The government has explained this discrepancy in the
declaration of SA Janet L. Irwin.  (File Entry #296, Attachment
D; File Entry #302.)  In that document, SA Irwin explained that
at the beginning of the wiretap investigation on February 5,
2003, she did not know the targets' names.  The original wiretap
minimization instruction did not list target names but only the
target telephone to be intercepted.  However, on July 3, 2003,
Judge Parr requested a particular minimization instruction be
used for CA Order #5.  To try to create uniformity throughout the
case, SA Irwin created minimization instructions for CA Orders
#1-4 to match the minimization instruction for CA Order #5,
causing the discrepancy by listing the names for the minimization
instruction that were not known when the wiretap orders were
issued.  This declaration adequately explains that Carranza's

identity was unknown when CA Order #2 was issued.  Defendants

have not challenged or even responded to SA Irwin's declaration.[5]

Thus, having carefully examined Defendants' argument, the

court concludes that SA Irwin's affidavit thus succeeds in

explaining how surveillance had been attempted and why it was

unlikely to succeed without the aid of a wiretap.

---

[5]In its memorandum opposing Defendants' motion, the
government provides even more information about how surveillance
had been unsuccessful that was not known at the time of the
affidavit and thus not included therein.  The government
explained that Defendant Carranza was arrested and deported on
February 14, 2003.  Defendant Carranza asserts an unsupported
argument in his memorandum that this revealed that investigators
knew of his identity and connection to the organization at that
time.  The government explains that the opposite was true and
that instead the arrest and deportation of Carranza reveals the
shortcomings of surveillance alone.  According to the government
(and Defendants have not refuted this information), Defendant
Carranza was encountered on February 11, 2003, as a passenger in
a vehicle stopped by the Perris, California Police Department.
The vehicle stopped was the same vehicle which was observed on
February 11 described in the affidavit in paragraph 29.  At that
time, investigators were trying to identify the vehicle's driver
and owner, but were unaware of Carranza's connection to the
investigation.  At that point, investigators had been monitoring
CA Target Phone #1 for less than ten days, and only one known
reference to anyone named "Abel" had surfaced, in call number 365
between Compagna and Erenas on February 12, 2003.  The government
explains that Carranza's deportation was an inadvertent side-
effect of the attempt to identify Alvarado, the vehicle's driver
and owner, and agents did not become aware of this connection to
the investigation until Carranza later resurfaced on the wiretap
after illegally reentering the United States.  (File Entry #296,
at 22-23.)

### ii.   Questioning or Interrogation of Witnesses or Participants (Including the Use of Grand Juries and the Grant of Immunity if Necessary)

The affidavit explained that at the stage of investigation when the government was seeking CA Order #2, it was unlikely that interviewing witnesses would successfully allow the government to expose and prosecute the entire DTO because of individuals' fear for their physical safety, the safety of their family, or because of their own culpability.  The affidavit explained that even if given immunity, a member of the DTO would likely have fear of retribution against himself or herself or her family.  In addition, the investigation would likely be jeopardized because it was likely a that member of the DTO would inform other members of the DTO about the investigation.

Defendants argue that the affidavit's discussion of this untried technique was merely boilerplate, could apply to any drug investigation, and should thus fail.  However, simply because the same factors that make a particular technique unlikely to succeed in one case exist in other similar cases does not automatically negate that the affidavit has shown necessity.  Rather, similar factors can exist in many cases of a similar nature.  Here, the affiant demonstrated a reasoned basis for believing cooperation could endanger potential cooperators and did not appear to exaggerate the danger.  Cf. Killingsworth, 117 F.3d at 1164-65. Thus, the court rejects Defendants' argument.

31

### iii.   Use of Search Warrants

The affidavit also explained the consideration that had been given to search warrants and the difficulties involved in trying to execute search warrants at that point in the investigation. The subscriber address for CA Target Telephone #3 was fictitious, and agents obviously could not execute a search warrant on a nonexistent address.  Further, the affidavit explained that at the time, the agents did not know where else to serve search warrants other than the possible address to CA Target Telephone #2.

In addition, the affidavit explained that even if the agents had a valid address upon which to serve a search warrant, doing so at that point in the investigation would jeopardize the purpose of the investigation; it would not likely provide the evidence necessary to determine the full scope of the criminal activities, the various methods being used by the organization's members, and the identities of those involved.  This is partly because records kept by criminal conspirators often are difficult to interpret because of coded information contained therein. Further, even lists of addresses, names, telephone numbers, and cash would not yield all the information investigators were seeking without the aid of information retrieved from intercepted conversations.  The affidavit explained that as the investigation proceeded, and more information was obtained, investigators would be in a better position to utilize a search warrant

In this way, the affidavit adequately explained why search warrants would not be effective at that stage of the investigation.

### iv.   Infiltration of Conspiratorial Groups by Undercover Agents or Informants

The affidavit also carefully explained why the use of informants and undercover agents had either failed or would fail, and Defendants have not challenged the sufficiency of this aspect of the affidavit.  The affidavit specifically described the failure of CIs to aid agents in achieving the purpose of their investigation and the unwillingness of the CIs to testify for fear of retaliation towards their families.  The affidavit also explained in detail the difficulties and unlikelihood of success of an undercover agent penetrating the DTO.  Such organizations, the affidavit explains, are generally very compartmentalized and do not allow the introduction of unknown members into the hierarchy of the DTO, which is usually comprised of immediate family members or blood relatives.

As explained, Defendants have not challenged this aspect of the affidavit, and the court concludes it sufficiently explained how the technique had been unsuccessful, would be unsuccessful, or would be too dangerous.

### v.   Pen Registers or Trap and Trace Devices

Defendants' challenge to the affidavit's explanation of toll and pen register analysis, subscriber information, and trap and

trace devices in the investigation was based on his argument, addressed above, that there were indications some of Defendants' identities were known to agents at that time.  However, as discussed above, the government has provided information clarifying any such indications, explaining that Defendants' identities were not known at the time, and Defendants have not responded to these explanations.

Furthermore, the court has reviewed the section of the affidavit addressing this investigative technique and concludes that it sufficiently explained how the technique had been unsuccessful, would be unsuccessful, or would be too dangerous without the assistance of a wiretap.

### vi.  Other Normal Investigative Techniques

Finally, the affidavit also addressed two investigative techniques and explained how they had been unsuccessful and would continue to be unsuccessful in accomplishing the goal of the investigation:  trash searches and consensual recordings.

The affidavit explained how the trash searches were not successful because law enforcement were stymied by false addresses, heavy pedestrian traffic, and indications of extreme caution by the targets.  Further, with regards to CA Target Phone #3, investigators did not have a valid address for the phone, and could not execute a trash search on an address that did not exist.  The affidavit further explained that even if the address became available, it was common for drug traffickers to carry

34

trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement personnel, so future trash searches based on information acquired in the future may serve to be futile.

Second, the affidavit explained that consensual recordings were not possible at that time because no CI had direct contact with Erenas (known then as "Hector") or his associates.

As such, the affidavit successfully explained why other normal investigative techniques had been unsuccessful and would continue to be unsuccessful in accomplishing the goal of the investigation.

In conclusion, based on the analysis of each of the techniques the Tenth Circuit requires be addressed before a wiretap may legally issue, this court concludes that necessity was shown for CA Order #2, and specifically for CA Target Phone #3.  The court next examines whether necessity was shown for CA Order #3.

### b.   CA Order #3

CA Order #3 authorized the interception of communications over CA Target Phone #5 and CA Target Phone #6a.  As set forth above, of the defendants involved in this motion to suppress, only Carranza and Pedro Lopez have standing to challenge the wiretap for CA Target Phone #5, and only Carranza has standing to challenge the wiretap for CA Target Phone #6a.  James Corcoran, a Detective for the Bell Police Department, submitted an affidavit

35

supporting the government's application for CA Order #3.  (File
Entry #258, Exhibit D.)  Thus, the court examines Detective
Corcoran's affidavit to determine whether the government showed
necessity as to CA Order #3.

### i.   Why a Wiretap Was Necessary to Investigate Carranza's Involvement With the Case

Before examining the adequacy of the affidavit under the
factors required by <u>Castillo-Garcia</u> and <u>Killingsworth</u>, the court
first addresses Carranza's argument that when CA Order #3 was
applied for, investigators knew his identity but did not make a
special showing that despite that fact, a wiretap was necessary
to investigate him.

The affidavit did identify Carranza, and identified him as
the primary user of CA Target Phone #6a.  The affidavit specified
the many ways investigators believed Carranza was involved in the
DTO and what caused them to have those beliefs.  For example, the
affidavit specified how Carranza had been involved in
conversations with Erenas and Compagna, which resulted in
investigators seizing approximately ten pounds of crystal
methamphetamine ("ice) from a Jeep Grand Cherokee with Utah
license plates.  The affidavit explained how intercepted
conversations had indicated that Carranza was packaging and
preparing for concealment the "ice" later seized.  The affidavit
also described how investigators had obtained records showing a
calling pattern between CA Target Phone #6a and other phones

36

known to be used by members of the DTO for trafficking that
caused investigators to believe that Carranza was using CA Target
Phone #6a to facilitate drug trafficking.  As described below,
the affidavit set forth the necessity of obtaining a wiretap for
CA Target Phone #6a to succeed in their investigation.

### ii.  Surveillance

Detective Corcoran set forth in his affidavit the ways
surveillance continued to be used in the investigation of the
DTO.  Included in that description of the surveillance used were
summaries of specific instances where surveillance had been used
on the targets.  Defendants argue that those specific instances
described in the affidavit make clear that the government
surveillance was not as ineffective as the government claims it
was.  After carefully reviewing Detective Corcoran's affidavit,
the court rejects Defendants' argument.

The specific instances of surveillance recounted by
Detective Corcoran actually illustrated the difficulty of
gleaning any useful information from surveillance alone.  For
example, Detective Corcoran recounted an episode on March 18,
2003, in which a car that was being watched was parked at a
residence.  Investigators watched two male Hispanics standing by
the parked car.  One of the men opened the trunk then closed it,
and then both men walked up to the house empty-handed.  From this
observation, investigators could not determine if any contraband

was in the car's trunk or who the two men were.  As a result, surveillance was ended soon thereafter.

Another example occurred on March 21, 2003, when investigators were watching a different car that had been involved in an attempted distribution of "ice" eight days earlier.  Investigators followed the car to Erenas's house, where two men came out of the house and got in the car, which then drove away.  Investigators continued to follow the car to several businesses.  The car then returned to Erenas's house, where the men got out of the car.  The car left, and the investigators continued to follow it.  The driver of the followed car then began engaging in obvious and aggressive counter-surveillance maneuvers for approximately ten minutes.  It drove in circles, through business parking lots, and drove on the same streets repeatedly before arriving at a Mexican restaurant, where the driver met two men.  Eventually the driver got back in the car and drove back to the home where surveillance had begun, then went inside the house.  At that point, investigators ended surveillance.

Thus, both of these examples of surveillance without the assistance of the wiretap revealed that investigators both had a difficult time discerning whether any illegal activity was occurring simply from observing, and that, as investigators had already explained, the targets were cautious of any surveillance

and, in the second instance, were obviously aware that they were being followed.

On the other hand, Detective Corcoran's affidavit revealed that with the assistance of a wiretap, careful surveillance could be effective.  The affidavit described when surveillance was conducted on March 29, 2003, when, along with information learned from the wire intercepts being received at the time, law enforcement was able to seize ten pounds of "ice" from the DTO. The affidavit explained that the intercepted communications allowed investigators to learn the time, date, place, and vehicle involved in the transaction, and was able to record incriminating communications between the targets before, during, and after the seizure.  This example contrasts against the two examples above where surveillance alone was ineffective.

Furthermore, the affidavit specifically addressed how surveillance was ineffective and why wiretaps of CA Target Phone #5 and CA Target Phone #6a were necessary to help in the investigation.  The affidavit explained that the subscriber addresses for both phones are actually business addresses for pager and cellular telephone providers, and that without wire intercepts, surveillance of these addresses would likely prove counterproductive because of the amount of vehicular and pedestrian traffic in the area.  Also, the affidavit explained that narcotics traffickers often obtain cellular telephones with fictitious subscriber addresses, which was probably the case with

CA Target Phones #5 and #6a.[6]  In addition, the affidavit
explained that "Abel" (Carranza) was suspected of being the
driver of the car under surveillance, described above, that had
engaged in counter-surveillance maneuvers, and that with only
that surveillance, investigators could not determine the
significance of the activities "Abel" was involved in.

As a result, the court rejects Defendants' argument and
concludes that the affidavit adequately explained why
surveillance without the assistance of a wiretap would be
ineffective.

### iii.  Questioning or Interrogation of Witnesses or Participants

Defendants argue that if the government had "pressed harder
to extract information from the targets it had identified through
[CA Order #2], a third wiretap would not have been necessary."
(File Entry #258, at 9.)  Based on the context of this argument,
it appears that Defendants are specifically referring to when the
authorities seized the approximately ten pounds of "ice."

---

[6]In addition, throughout much of the affidavit, Detective
Corcoran provides extensive specific information explaining why
wiretaps were requested for CA Target Phones #5 and #6a.  Among
other explanations, the affidavit described how Erenas had
abandoned his former phone, which had been wiretapped, after
officers seized a vehicle during a drug run, and had recently
become the primary user of CA Target Phone #5, probably to
facilitate his narcotics trafficking activities.  The affidavit
also explained how "Abel" (Carranza) had been overheard on
earlier wiretaps involved with conversations related to drug
trafficking with "Hector" (Erenas) and that "Abel" appeared to be
the primary user of CA Target Phone #6a.

However, Defendants do not specify how investigators could have pressed harder to extract information from the targets, especially considering the nature of the organization being investigated.  As Detective Corcoran explained in his affidavit, members of DTOs of this sort are generally unwilling to testify for fear of their physical safety and the safety of their families.  In addition, such interrogation would likely reveal the extent of the greater investigation being conducted and would likely result in those being questioned informing others in the DTO of the investigation, thus jeopardizing the entire investigation.

As a result, the court rejects Defendants' argument and concludes that the affidavit adequately explained why this technique likely would be unsuccessful or too dangerous.

### iv.   Use of Search Warrants

The affidavit explained why the use of search warrants without the assistance of wire intercepts would likely be ineffective, possibly alert targets of the investigation, and would be premature at that stage of the investigation. Defendants do not appear to contest this aspect of the affidavit, and the court concludes that it is adequate.

### v.   Infiltration of Conspiratorial Groups by Undercover Agents or Informants

Detective Corcoran's affidavit explained how four separate reliable CIs had provided credible information during the course

41

of the investigation; however, none of the CIs could provide any information on the DTO.  Therefore, the use of CIs did not allow investigators to accomplish their goal.  In addition, Detective Corcoran itemized the problems anticipated with using undercover agents.  These problems were the same ones itemized by SA Irwin in her affidavit supporting the application for CA Order #2: that large-scale DTOs tend to deal only with those known to them and trusted by the group, who are often immediate family members or blood relatives, and that DTOs are compartmentalized so that members at low levels of the DTO do not have access to information about those at the top of the hierarchy.  Defendants have not contested this aspect of the affidavit, and the court concludes that it adequately set forth how this investigative technique had been unsuccessful and likely would be unsuccessful in the future.

### vi.   Pen Registers or Trap and Trace Devices

The affidavit described how investigators had used and would continue to use toll and pen register analysis in the investigation.  The affidavit also described the significant limitations of this investigative technique, such as only providing information regarding numbers called by a particular telephone and the frequency of those calls.  The resultant list did not tell investigators which calls related to narcotics trafficking.

42

Earlier in the affidavit, Detective Corcoran explained how this type of investigative technique had already been applied to CA Target Phones #5 and #6a.  Those phones were subscribed to false names and addresses, but investigators were still able to discern who was using those phones, partially with the assistance of earlier wiretaps.  Although the identities of both Erenas and Carranza had been discovered, only using toll and pen registers did not allow the investigators to discover the identities of others involved in the DTO, nor could investigators learn about the DTO's activities.

After carefully examining this explanation in the affidavit, the court concludes that it adequately explained why toll and pen registers, without the assistance of the wiretaps, would be unsuccessful in helping investigators to accomplish the objective of their investigation.

### vii.  Other Normal Investigative Techniques

Finally, as with SA Irwin's affidavit, which supported the application for CA Order #2, Detective Corcoran's affidavit also examined the possibility of using trash searches and consensual recordings and successfully explains why these investigative techniques would not be effective.  The affidavit explained how since the seizure of the ten pounds of "ice," Erenas and Carranza had become very conscious of the presence of law enforcement, and the residences of both Erenas and Carranza were in high pedestrian foot traffic locations, making a trash search without

alerting the targets very difficult.  Regarding consensual recordings, the affidavit explained how no CI or undercover agent currently had direct contact with Erenas or his close associates, making such recordings impossible.

Defendants have not contested these sections of the affidavit, and the court concludes that they are adequate.

In conclusion, the court concludes that necessity was properly shown for the issuance of CA Order #3.  The court next examines whether necessity was properly shown for CA Order #4.

### c.   CA Order #4

CA Order #4 authorized the interception of communications over CA Target Phone #6b, CA Target Phone #7a, and CA Target Phone #8.  As set forth above, of the defendants involved in this motion to suppress, only Carranza has standing with regards to CA Phones #6b and #7a, and none of Defendants have standing with regards to CA Phone #8.  Therefore, with regards to CA Order #4, the court only examines whether necessity was shown as to CA Target Phones #6b and #7a.  SA Irwin submitted the affidavit supporting the government's application for CA Order #4.  Thus, the court examines SA Irwin's affidavit to determine whether the government showed necessity.

The affidavit described how CA Target Phone #6b was subscribed to by a Ralph Lopez, but that investigators had determined that it was used by Carranza.  The affidavit also described how CA Target Phone #7a was subscribed to by an Irma

Serrano, but that investigators had determined that it was used by Erenas.   The affidavit described how, with the use of toll and pen register analysis, investigators had determined the frequency of calls from the target phones, and that based on various information, investigators concluded that these phones were being used in narcotics trafficking.

As with the above two-analyzed affidavits, this third affidavit also examined each of the investigative techniques required by <u>Castillo-Garcia</u> and <u>Killingsworth</u>.   The court has carefully reviewed the affidavit and its description of each of the investigative techniques addressed and concludes that each of those techniques is addressed adequately and in a way that is specific to the case.

### i.   Surveillance

The affidavit described how agents had been monitoring a video camera which observed Carranza's residence; however, although agents could observe vehicles arriving and departing from the residence, the camera only provided a partial view of the residence, making it difficult for agents to identify activities consistent with narcotics trafficking.   The affidavit further detailed other problems with surveillance without the aid of wire intercepts.   In contrast to those problems, the affidavit also detailed how, in conjunction with earlier wire intercepts, law enforcement had found Erenas and others pulled over to the side of the road.   Inside the vehicle, law enforcement found

$21,000 in cash.  Based on wire intercepts, investigators believed Erenas and those with him were in the process of delivering this money to Mexico.

Defendants have not challenged this section of the affidavit, and the court concludes that it is adequate.

### ii.   Questioning or Interrogation of Witnesses or Participants

Defendants argue that the government failed to stop and directly question targets when it had the chance.  Defendants argue "[i]t does not appear that the investigation was compromised by such interaction, and more specific questioning should have been pursued to avoid the need for a wiretap.  Even assuming it was unlikely for the individuals to reveal information about the underlying offense, it was an opportunity to gather much needed identification information without having to resort to a wiretap."  (File Entry #258, at 10.)  Defendants appear to specifically be referring to the incident in which law enforcement discovered the $21,000 in the vehicle used by Erenas.

However, Defendants do not address the reasons specified in the affidavit for not questioning or interrogating witnesses or participants at that point.  Defendants do not address the unlikelihood of someone being willing to cooperate for fear of the safety of himself, his family members, or because he himself was culpable.  When examining this issue in a practical and commonsense fashion, the court concludes that Defendants have not

met their burden showing that this investigative technique would have been successful or would not have been too dangerous. Specifically, Defendants appear to ignore the objective of the investigation and the concerns of investigators that questioning targets at the wrong time would jeopardize the entire investigation.  Simply because law enforcement had the opportunity to interrogate Erenas does not mean that they should have done so at that particular time, and the government set forth specific, legitimate reasons in the affidavit explaining why such action would likely not have succeeded or would have been too dangerous.  Furthermore, considering the government's affidavit, interrogating Erenas at that point would likely not have negated the necessity of the wiretaps.

As a result, the court rejects Defendants' argument and concludes that this section of the affidavit adequately meets the required standard.

### iii.  Use of Search Warrants

Defendants also argue that the government's assertion that the use of search warrants at this point in the investigation would compromise the investigation was refuted by the episode recounted in the affidavit involving the discovery of the $21,000.  (File Entry #258, at 10.)  However, as with Defendants' above-stated argument, Defendants have failed to specifically explain how the use of search warrants at other key locations would have been successful and not jeopardized the investigation

47

in light of the concerns stated in the affidavit.  The incident
involving the $21,000 was unusual because Erenas was already
pulled over to the side of the road with apparent car trouble.
The resulting incident would not necessarily result in suspicions
that the authorities had investigated the entire organization,
unlike if search warrants were used.

Therefore, because Defendants have failed to adequately
refute the reasons stated in the affidavit as to why the use of
search warrants at that time would be unsuccessful in
accomplishing the goal of the investigation, and because the
court concludes that this section of the affidavit is adequate,
the court rejects Defendants' argument.

### iv.   Infiltration of Conspiratorial Groups by Undercover Agents or Informants

As in the affidavits supporting CA Orders #2 and #3, the
affidavit supporting CA Order #4 described the attempted use of
CIs, how that use had failed because none of the four informants
used had given helpful information about the DTO, and why
undercover agents would have had a very difficult time
infiltrating the DTO to a level that would be helpful to
investigators.  Defendants have not challenged this aspect of the
affidavit, and the court concludes that it is adequate.

### v.   Pen Registers or Trap and Trace Devices

The affidavit set forth how toll and pen registers had been
used in the investigation and would continue to be used, but how

48

that investigative technique was ineffective without the help of wire intercepts.  Defendants have not challenged this part of the affidavit, and the court concludes that it is adequate.

### vi.  Other Normal Investigative Techniques

As with the earlier affidavits supporting CA Orders #2 and #3, the affidavit supporting CA Order #4 described trash searches and consensual recordings and how those investigative techniques were not successful at that point.  Defendants have not challenged these parts of the affidavit, and the court concludes that they are adequate.

In conclusion, the court concludes that necessity was properly shown for CA Order #4 and the resultant wiretaps.  The court next examines whether necessity was adequately shown for CA Order #5.

### d.  CA Order #5

CA Order #5 authorized the interception of communications over CA Target Phone #7b, CA Target Phone #9, and CA Target Phone #10.  As set forth above, of the defendants involved in this motion to suppress, only Carranza has standing to challenge the wiretap on CA Target Phones #7b and 10, and only Hipolito Lopez, Pedro Lopez, and Carranza have standing to challenge the wiretap on CA Target Phone #9.  SA Irwin submitted an affidavit supporting the government's application for CA Order #5.  Thus, the court examines SA Irwin's affidavit to determine whether the government showed necessity with regards to these three wiretaps.

The affidavit set forth why investigators believe that CA Target Phones #7b, #9, and #10 are being used in narcotics trafficking.  The affidavit identified and described a few of those people whose communications investigators sought to intercept, including Carranza.  The wiretap identified that the primary user of CA Target Phone #7b was Erenas, the primary user of CA Target Phone #9 was Compagna, and the primary user of CA Target Phone #10 was Carranza.  The affidavit set forth why investigators believed CA Target Phone #7b was used to coordinate and direct the facilitation and distribution of narcotics throughout the Southern California area to other members of the DTO.  The affidavit also set forth why investigators believed CA Target Phone #9 was being used to coordinate narcotics transactions with Erenas, and why investigators believed CA Target Phone #10 was being used to direct subordinates in the DTO to meet with and conduct narcotics-related transactions with other narcotics traffickers.  To show that wiretaps on these three phones was necessary, the affidavit once again addressed all of the investigative techniques required by Castillo-Garcia and Killingsworth to show why without the wiretaps, the purpose of the investigation would not be achieved through these less intrusive investigative techniques.

The only argument regarding this wiretap Defendants appear to present is that at this point in the investigation, Defendant Carranza had been the subject of two previous wiretaps and "the

50

government offers no reason why such intrusive surveillance was necessary.  While the same conclusory allegations made in prior applications are made again, nothing shows why the investigation of Carranza-Martinez in particular requires a wiretap."  (File Entry #258, at 10-11.)

The court has carefully reviewed SA Irwin's affidavit and rejects Defendants' argument.  The affidavit, though similar to earlier affidavits, also contained updated information explaining the necessity of the wiretaps.  For example, when discussing the use of search warrants, the affidavit explained that without the use of wire intercepts, warrants may be executed while the target subjects are in Mexico, which would then, of course, alert the subjects to the investigation and make it difficult to apprehend them.  In addition, the affidavit explained that with the use of the wire intercepts, investigators could learn the multiple locations that the narcotics and proceeds were being kept. Another example set forth in the affidavit involves trash searches.  The affidavit explained that investigators considered conducting a trash search at Compagna's residence.  However, during surveillance, investigators observed an Hispanic male from the residence carry a large trash container out to the curb approximately five minutes before trash was due to be picked up, and then directly after the trash was obtained from the city garbage truck, the same man brought the large trash container into the back yard where it stayed behind a ten foot high fence.

Other examples include the use of physical surveillance, and how investigators had seen targets meeting with other people, handing over a paper, and so forth, but without the aid of wire intercepts, investigators could not discern whether illegal activity was taking place.

With respect to Carranza specifically, the affidavit carefully set forth his connection to the organization, including an explanation that investigators believed he was a stash house worker for the DTO.  The affidavit acknowledged that Carranza's phone had previously been wiretapped, but explained how those wiretaps had confirmed investigators' suspicions that Carranza was in communication with Erenas regarding narcotics trafficking. The affidavit explained that Carranza had been much more cautious of law enforcement surveillance since the ten pounds of "ice" had been seized, making surveillance of him and trash searches targeting him particularly difficult.

Having carefully reviewed the affidavit, the court concludes that the affidavit adequately set forth why it was necessary to obtain wiretaps of all three phones, including the one used by Carranza, even though some of those people had been identified and been the subjects of previous wiretaps.

In addition, the court reiterates, in response to Carranza's argument, that discovering Carranza's identity, individual actions and crimes were not the only objectives of the investigation.  As previously discussed, investigators were

52

attempting to discern the scope of the DTO and all who were involved in it while collecting evidence to show their culpability.  Carranza was known by investigators to be deeply involved in the DTO, and the conversations overheard from the taps on his phone revealed more than simply his involvement in the DTO; they revealed the involvement of others in the DTO and the methods and scope used by the DTO.  The affidavit supporting CA Order #5, as the other affidavits did, adequately addressed the investigative techniques less invasive than wiretaps and adequately demonstrated that they were not successful, were unlikely to be successful, or were too dangerous.  The court therefore rejects Defendants' argument that necessity was not shown for CA Order #5.

In summary, the court concludes that necessity was shown for all four of the challenged California court orders and the resultant wiretaps.  The court now turns its attention to Defendants' argument that the evidence obtained from the wiretaps should be suppressed because investigators failed to properly minimize the wire intercepts.

### 4.  Minimization

Wiretapping or electronic surveillance must "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . ."  18 U.S.C. § 2518(5).  To determine whether the government properly minimized calls, this court must focus on the reasonableness of the agents'

efforts to refrain from monitoring conversations deemed non-pertinent to the investigation.  See Scott v. United States, 436 U.S. 128, 139 (1978); United States v. Willis, 890 F.2d 1099, 1101 (10th Cir. 1989); United States v. Apodaca, 820 F.2d 348, 350 (10th Cir.), cert. denied, 484 U.S. 903 (1987). "Reasonableness must be determined from the facts of each case." Willis, 890 F.2d at 1101.  "Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case."  Scott, 436 U.S. at 139.  "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations.  Whether agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case."  Id. at 140.

Furthermore, in determining reasonableness, "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer."  Id.  "Such percentages may provide assistance, but there are . . . cases . . . where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable."  Id.

In addition, "when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.  And it is possible that many more of the

54

conversations will be permissibly interceptible because they will involve one or more of the co-conspirators."  Id.

The type of phone being wiretapped may also have some bearing on the type of minimization required.  For example, a tap on a public telephone would require greater minimization, while a tap on the personal phone of the head of a major drug ring would allow for the interceptions of more conversations.  See id.

Also, officers should be given extra leeway in the early stages of investigation when it is difficult to determine which calls are relevant and which are irrelevant.  See id. at 141.

In the case before the court, detailed oral instructions relating to how minimization was to be accomplished were provided to all those who conducted monitoring, and no person was permitted to engage in monitoring without first acknowledging receipt of the instructions by signing the acknowledgment sheet. (File Entry #317, at 8-9.)  The substance of these instructions have been provided by the government.  (File Entry #317, at 9-19.)

The government has explained that whether a call is relevant or pertinent is not a static concept during an investigation. (File Entry #317, at 23.)  For example, early in the investigation, calls of a non-drug nature that identify targets and their associates by name, address/location, or relationship all are pertinent and relevant to the investigation.  At any time in the investigation, calls in which travel plans or meeting

locations are discussed are pertinent for the purpose of conducting surveillance or knowing if a target is planning on leaving the state or country.  Monitors would re-listen to calls in an effort to determine whether they were pertinent because sometimes the code language being spoken by the targets made it difficult to determine the pertinence of the calls the first time they were heard.  The monitors were interviewed in this case and they explained that the coded language used by drug traffickers sometimes included agricultural or other legitimate business terms, such as calling drugs "beans."

In this case, SA Shannon L. Carrizal, Assistant United States Attorney Michael P. Kennedy, and SA Bacon reviewed the line sheets for all calls two minutes or longer and all calls for which minimization occurred on the CA Target Phones.  The statistical information derived from this investigation is summarized as follows[7]:

(1) CA Target Phone #1:  A total of 966 calls were intercepted over CA Target Phone #1.  Of those 966 calls, 101

---

[7]The following information was provided by the government in File Entry #317, Notice of Submission of Supplemental Information on Minimization Compliance in California Wiretaps.  That filing included Attachment A, the Declaration of Special Agent Shannon L. Carrizal, from which this court has obtained the main information used in its minimization analysis of the California wiretaps.  None of Defendants ever filed a response to this document, and at the oral argument hearing, none of Defendants opted to respond orally to it.  Therefore, Defendants have not disputed the information contained within this document and the court relies on it in its analysis.

were over two minutes, and of those 101 calls, eight calls were minimized at least once.  Of the 101 calls, five calls were classified as non-pertinent that were not minimized.

(2) CA Target Phone #2:  A total of 185 calls were intercepted over CA Target Phone #2.  Of these calls, nine were over two minutes, none of which were minimized.  Of those nine calls, none were classified as non-pertinent.

(3) CA Target Phone #3:  A total of 915 calls were intercepted over CA Target Phone #3.  Of those calls, 149 were over two minutes, and of those 149 calls, four were minimized at least once.  Of the remaining 149 calls, 41 calls were classified as non-pertinent that were not minimized.

(4) CA Target Phone #4:  A total of 116 calls were intercepted over CA Target Phone #4.  Of those calls, 22 were over two minutes, and of those 22 calls, four were minimized at least once.  Of the remaining 22 calls, seven calls were classified as non-pertinent that were not minimized.

(5) CA Target Phone #5:  A total of 836 calls were intercepted over CA Target Phone #5.  Of those calls, 133 were over two minutes, and of those 133 calls, fourteen were minimized at least once.  Of the remaining 836 calls, 38 calls classified as non-pertinent were not minimized.

(6) CA Target Phone #6a:  A total of 883 calls were intercepted over CA Target Phone #6a.  Of those calls, 141 were over two minutes, and of those 141 calls, 88 were minimized at

least once.  Of the remaining 141 calls, nineteen calls were classified as non-pertinent that were not minimized.

(7) CA Target Phone #6b:  A total of 353 calls were intercepted over CA Target Phone #6b.  Of those calls, 60 were over two minutes, and of those 60 calls, 32 were minimized at least once.  Of the remaining 60 calls, five calls were classified as non-pertinent that were not minimized.

(8) CA Target Phone #7a:  A total of 1,021 calls were intercepted over CA Target Phone #7a.  Of those 1,021 calls, 180 were over two minutes, and of those 180 calls, eleven were minimized at least once.  Of the remaining 180 calls, 40 calls were classified as non-pertinent that were not minimized.

(9) CA Target Phone #7b:  A total of 486 calls were intercepted over CA Target Phone #7b.  Of those calls, 48 were over two minutes, and of those 48 calls, seven were minimized at least once.  Of the remaining 48 calls, eleven calls were classified as non-pertinent that were not minimized.

(10) CA Target Phone #8:  A total of six calls were intercepted over CA Target Phone #8.  Of those calls, three were over two minutes, but no audio was recorded.

(11) CA Target Phone #9:  A total of 445 calls were intercepted over CA Target Phone #9.  Of those calls, 76 were over two minutes, and of those 76 calls, none were minimized, and only one call was classified as non-pertinent and not minimized.

(12) CA Target Phone #10:  A total of 774 calls were intercepted over CA Target Phone #10.  Of those calls, 128 calls were over two minutes, and of those 128 calls, 30 were minimized at least once.  Of the remaining 128 calls, 22 calls were classified as non-pertinent that were not minimized.

In summary, the government has identified a total of approximately 6,986 calls for the twelve California target phones, of which the initial review (including ring and connect time) indicates approximately 1,050 were over two minutes, but of those 1,050 calls only 189 calls were classified as non-pertinent that were not minimized.  If the court assumes that all 189 calls classified as non-pertinent were non-pertinent, only .027 percent of the total calls were subject to a failure to minimize, reflecting an accuracy rate of 99.97 percent.  Under the same assumption, 18 percent of all calls two minutes or longer were subject to a failure to minimize, reflecting an accuracy rate of 82 percent.[8]

When evaluating the statistical information in light of the facts and circumstances in this case, the court concludes that the government met the minimization requirement of 18 U.S.C. §

---

[8]The government points out that of the 189 calls classified as non-pertinent that were not minimized, 32 calls related to agricultural topics, the legitimacy of which was not clear to the monitors at the time the call was placed.  If these 32 calls are subtracted from the 189, 157 calls remain, leaving 14.9 percent of non-pertinent, non-minimized calls, for an accuracy rate of 85.1 percent.

2518(5).  Cf. Willis, 890 F.2d at 1102 (concluding that 70%
minimization was reasonable); United States v. Apodaca, 820 F.2d
348, 350 n.3 (10th Cir. 1987) (concluding that 216 minimized
calls of approximately 1,287 completed calls of more than 2
minutes duration was reasonable).  The court particularly finds
these numbers to be reasonable in light of three major factors
present in this case.  First, the vast majority of all of the
conversations over both intercepted phone lines were in Spanish.
Even though experienced linguists were monitoring, that factor
must be considered.  Second, members of the DTO used code words
throughout their conversations.  The monitor was thus required to
evaluate the context in which the code words were spoken in a
short period of time.  Third, the monitors had very limited
information at the beginning of the investigation regarding the
targets and their associates.  Investigators were trying to
discover details regarding the entire distribution network.

Defendants argue that one call, call #91, from Carranza,
from CA Target Phone #6a, should have been minimized as a doctor-
patient privileged call.  However, the government has provided
good reasons explaining why this particular call was not
minimized.  First, this call occurred on the fifth day of the
wiretap on CA Target Phone #6a.  At this early time in the
wiretap, Carranza had not been identified by full name.  The call
was approximately one minute, 48 seconds long, of which
approximately 18 seconds was ring and connect time.  Upon

reviewing the call, it was discovered that at no point in the call do either of the speakers refer explicitly to medical records, and the individual who answered the phone does not identify himself as a doctor or medical employee, and no actual medical information ever is discussed.  The monitor for this call explained that she continued to monitor the call because of the identifying information being given and because no actual medical information was disclosed.  Furthermore, upon research, it was determined that the phone number to which this call was placed was a cellular telephone subscribed to by Edgar Ramirez of an address on E. Rosewood Street, Rialto, California.  Nothing in this information suggests a doctor's office was the location of the recipient of this call.  Thus, the government has adequately explained why this call was not minimized.  Carranza has not even responded to the government's explanation.  As a result, the court accepts the government's explanation and finds that the monitoring of this call was reasonable in light of the attempt to retrieve identifying information about Carranza, particularly because it was intercepted early in the wiretap.

Thus, in light of the statistical information presented to the court and the facts and circumstances of the case, the court concludes that the government has shown that the government's minimization efforts with regards to the California wiretap calls were reasonable.  Having made a prima facie showing of reasonable minimization, the burden then shifts to Defendants to show more

effective minimization could have taken place.  See Willis, 890
F.2d at 1102.  Defendants have failed to make such a showing.

Accordingly, the court rejects Defendants' arguments
regarding lack of necessity and minimization with regards to the
California wiretaps.  As a result, the court recommends that
Defendants' motion to suppress evidence derived from the
California wiretaps be denied.  The court next examines
Defendants' arguments regarding the Utah wiretaps.

### B.   The Utah Wiretaps

Hipolito Lopez filed a motion with a supporting memorandum
to suppress evidence obtained as a result of the Utah wiretaps.
(File Entries #107, 213.)  Two other defendants joined in
Hipolito Lopez's motion and memorandum:  Martinez (File Entries
#220, 314) and Pedro Lopez (File Entry #313).  Vargas filed a
separate motion to suppress the evidence derived from the Utah
wiretaps.  (File Entry #223.)  Two other defendants joined in the
motions and memoranda to suppress Utah wiretap evidence filed by
their co-defendants:  Ruesga (File Entry #245) and Rodriguez (The
Official Transcript of the Oral Arguments on the Motions to
Suppress, held March 22, 2005 (hereafter referred to as "3-22-05
Transcript") at 13.).[9]  Therefore, in total, six of the

_____

[9]Rodriguez never submitted a written motion to suppress.
However, his attorney notified the court at oral arguments that a
motion to join had been filed, but in the wrong name.  (3-22-05
Transcript at 13.)  Mr. Rodriguez's attorney did not provide the
court with a filing date, file entry number, or any other
information to allow the court to be positive which motion was

defendants are parties to the motions to suppress the evidence derived from the Utah wiretaps:  Hipolito Lopez, Martinez, Pedro Lopez, Vargas, Ruesga, and Rodriguez.

## 1.  Standing

The government has conceded that of the defendants before the court, all defendants have standing to challenge both Utah Order #1 and #2 except Carranza, Erenas,[10] Saucedo, and Ruesga. (File Entry #232, at 3 n.1.)  The government concedes that Erenas, Saucedo, and Ruesga were overheard on the first wire, and thus have standing to challenge only Utah Order #1.  (File Entry #232, at 3 n.1.)  The government asserts that Carranza was not overheard on any of the Utah wiretaps at issue, and thus does not have standing to challenge either of the Utah wiretap orders. (File Entry #232, at 3 n.1.)  Defendants have not disputed these assertions of the government, and the court accepts them.

## 2.  Probable Cause

The sufficiency of probable cause in a wiretap affidavit is examined to see if the facts and circumstances set forth by the affiant are "sufficient to warrant a person of reasonable caution to believe that an offense has or is being committed."  United

---

filed in the wrong name.  In order to err on the side of caution, the court simply considers Rodriguez to also have joined in the motions to suppress filed by his co-defendants.

[10]Of course, as noted earlier, Erenas has withdrawn is motions to suppress and is not involved in the motions to suppress before the court.

<u>States v. Armendariz</u>, 922 F.2d 602, 608 (10th Cir.), <u>cert.</u>
<u>denied</u>, 502 U.S. 823 (1991).  Probable cause need not be shown
for each interceptee; there need only be probable cause to tap
the telephone.  See <u>id.</u> at 1472 n.1.

     Defendants Hipolito Lopez and Martinez both allege in their
motions that the Utah wiretap orders were not supported by
probable cause.  Hipolito Lopez's memorandum, which Martinez
joined, does not address probable cause, and therefore the court
deems this argument abandoned by these two defendants and those
defendants who have joined in Hipolito Lopez's memorandum.

     In his separate motion/memorandum, Vargas alleges that
probable cause was lacking.  Vargas' entire argument regarding
probable cause consists of the following:  "It is the Defendant's
contention that there was not substantial evidence to find that
probable cause existed by way [of] the results of the police
undercover drug buys.  Thus, the Affidavit lacked probable cause
leaving the Affiant's allegations conclusory and insufficient to
authorize the wiretap."  (File Entry #223, at 3.)  This argument
put the government at somewhat of a loss (File Entry #232, at 4-
5), and has had that same effect on the court.  Neither of the
affidavits at issue makes any reference to police undercover buys
with the interceptees or violators named in the affidavits.
Thus, it is difficult to discern what Vargas is actually arguing.

     Nevertheless, the court has carefully examined the
affidavits supporting Utah Order #1 and Utah Order #2 to assess

64

probable cause generally, and the court rejects Vargas' argument
and instead concludes probable cause did support the two orders.
As the government carefully set forth in its memorandum, both
affidavits provided extensive details setting forth how probable
cause supported the government's application.  (File Entry #232,
at 6-7.)  For example, the affidavit supporting the application
for Utah Order #1 described in detail the incident in which
authorities seized the approximately ten pounds of
methamphetamine.[11]  The two men in possession of the Cherokee,
from which the drugs were seized, told authorities their address
was 454 Lander Way, Kearns, Utah, the same address as that to
which Utah Target Phone #1 was registered.  The affidavit also
detailed specific instances in which Compagna used both target
phones to arrange drug transactions with Erenas.  This detailed
information provided probable cause to support Utah Order #1.

Similarly, the affidavit supporting Utah Order #2 detailed
recent investigations, supported by interceptions from wiretaps
of Utah Order #1, showing that Hipolito Lopez and Pedro Lopez had
been using Utah Target Phones #1 and 2 to engage in illegal drug
activity.  Many calls included were placed to Vargas on Utah
Target Phone #5, and other calls showed the switch by Hipolito
and Pedro Lopez from using Utah Target Phones #1 and 2 to using
Utah Target Phones #3 and 4.  As with the first affidavit, this

---

[11] This incident is described above in the California
section.

detailed information provided probable cause to support Utah Order #2.

Therefore, the court rejects Vargas' argument and instead concludes that the two affidavits set forth in detail facts and circumstances "sufficient to warrant a person of reasonable caution to believe that an offense has or is being committed." Armendariz, 922 F.2d at 608.

### 3. Necessity

Second, Defendants argue that the affidavits supporting the Utah wiretap orders failed to show necessity. As set forth above in the court's analysis of whether necessity was shown in obtaining the California wiretap orders, "[t]o obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap." Killingsworth, 117 F.3d at 1163; accord Castillo-Garcia, 117 F.3d at 1187. If any of the four categories of normal investigative techniques referred to in Title III have not been tried, the government must explain why each of such untried techniques would be either unsuccessful or too dangerous. See Killingsworth, 117 F.3d at 1163; Castillo-Garcia, 117 F.3d at 1187. Those four techniques are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants; (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. See Killingsworth, 117 F.3d at

1163.  The government must also explain why (5) pen registers or trap and trace devices have not been tried, as well as (6) other normal investigative techniques, depending on the facts and circumstances of the case.  See id.; Castillo-Garcia, 117 F.3d at 1187-88.

The court next turns to Defendants' arguments.  Vargas does not specify in what way the affidavits did not show necessity; he simply cites case law holding that necessity must be shown. Hipolito Lopez argues that the affidavits' discussion failed to show necessity because they were devoid of specifics relating to the case and merely set forth boilerplate language or arguments that could be made in any narcotics trafficking case.

The court has carefully reviewed the affidavits at issue. Each affidavit specifically addressed the required categories of normal investigative techniques listed above.  The court examines those discussions as well as Defendants' arguments below.

### a.   Utah Order #1

SA Shannon L. Carrizal submitted the affidavit supporting the application for Utah Order #1.  The affidavit explained that an investigation was ongoing into the DTO.  The affidavit further explained the information agents had derived from other wire intercepts.  The affidavit then explained how other investigative techniques were unlikely to succeed or would be too dangerous.

### i.  Surveillance

First, the affidavit discussed surveillance.  The affidavit discussed several specific instances of surveillance and how they had been of limited or no value without the assistance of a wire intercept.  For example, the affidavit discussed how agents followed Hipolito Lopez and Martinez to various places throughout Salt Lake City, including various businesses, but without wire intercepts, agents were not able to determine the nature of the visits.  Other examples included surveillance that was conducted at the address listed on the registration of the Grand Cherokee in which the ten pounds of methamphetamine was found.  Nothing significant was observed at that address.  Also, surveillance noted in one instance that one vehicle appeared to be acting as a lookout for another vehicle.  Other specific instances of surveillance yielded no helpful information.  The affidavit explained that another problem with surveillance in this case was that the nature of the neighborhood where surveillance was being conducted was occupied by alert neighbors who tended to observe and be suspicious of new vehicles parked in front of their homes. Such attention, the affidavit explained, could jeopardize the investigation and alert the targets of the presence of law enforcement.

Thus, the affidavit specifically explained how surveillance had been tried and failed, would reasonably appear unlikely to

succeed in the future, or would be too dangerous without the
assistance of wire intercepts.

### ii.   Questioning and Interrogation of Witnesses or Participants

The affidavit explained how at that particular time, using
grand jury subpoenas would possibly jeopardize the investigation
and probably not yield useful information.  The affidavit
explained that those involved in the organization would likely
invoke their Fifth Amendment privilege not to testify, and that
granting immunity to someone at that stage of the investigation
would be unwise because it might foreclose prosecution of the
most culpable members of the conspiracy and would not ensure that
the immunized witnesses would provide truthful testimony.  The
affidavit explained that top members of the DTO needed to be
identified before immunity should be offered.  In addition, grand
jury subpoenas would certainly alert members of the DTO to the
investigation.

The affidavit also explained how interviewing violators or
associates would not succeed or would be too dangerous.  The
affidavit specifically referenced an interview of one target
after he was arrested for selling cocaine and methamphetamine to
an undercover agent.  That interviewee refused to provide his
supplier's name and information.  The affidavit explained that
interviewing other suspected members of the organization would
likely result in being given misinformation, false leads, and

would alert members of the DTO to the investigation.  The affidavit explained that interviews of drug dealers and customers are generally not productive because those interviewed fear for their safety, are culpable themselves, or have a sense of loyalty to their co-conspirators.

Thus, the affidavit explained how this investigative technique would reasonably appear unlikely to succeed or would be too dangerous.

### iii.   Use of Search Warrants

The affidavit explained how at that point in the investigation, using a search warrant would likely result in not finding a lot of useful information and would likely alert members of the DTO to the investigation.  The affidavit explained that based on the affiant's experience, in investigations such as these, wire intercepts often reveal multiple stash locations. Therefore, waiting until after investigators receive such information would more likely accomplish the objectives of the investigation.

### iv.   Infiltration of Conspiratorial Groups by Undercover Agents or Informants

The affidavit explained how a CI had been used to introduce an undercover agent into the DTO, but how that attempt had failed.  The affidavit also explained how a second CI had provided information to authorities, leading to the seizure of methamphetamine, but how that second CI would not actually make

70

buys from the DTO or introduce an undercover agent because that
second CI was afraid his/her identity would be revealed.  The
affidavit explained that CIs typically are not able to furnish
information fully identifying all members of the DTO, as the two
examples illustrated.

The affidavit also explained how the attempt to introduce an
undercover agent into the DTO had failed and how typically large-
scale DTOs only deal with those known to and trusted by them.
The affidavit also explained how such DTOs are compartmentalized,
and the introduction of an undercover agent in the lower end of
the DTO would probably never lead to that undercover agent
gaining information about anyone in the top of the DTO.  Thus,
the objectives of the investigation would not be achieved.

As such, the affidavit, through using specific attempts
during the investigation, set forth how this investigative
procedure had failed, would likely continue to fail, or would be
too dangerous.

### v.   Trap and Trace Devices

The affidavit explained how agents had used and would
continue to use pen registers, trap and trace devices, and toll
record analysis during the investigation.  The affidavit
explained that this technique only provided investigators with
the list of numbers called and did not establish the identities
of all the persons called or the content of the conversations.
Thus, the affidavit explained how the limitations of this

investigative technique prevented investigators from accomplishing their goal.

### vi.   Other Normal Investigative Techniques

The affidavit also explained how the use of trash searches and financial investigation had been tried and failed, would be likely to fail, or would be too dangerous.  The affidavit set forth information of two trash searches that had been conducted and the information they yielded.  The first trash search yielded two documents, but the second was unsuccessful because the residents had not put their trash out that night.  The affidavit explained that, based on investigators' experience, high-level drug traffickers frequently go to great lengths not to use their residential trash containers to dispose of valuable information; therefore, without the assistance of wire intercepts, it was unlikely future trash searches would yield significant amounts of important information.

In addition, the affidavit explained that, based on investigators' experience, it was common for drug traffickers to take their narcotic proceeds out of the country; therefore, a financial investigation based in the United States would likely not be successful.  The affidavit explained that while obtaining tax returns or credit reports may be helpful in tracing narcotics proceeds collected by the DTO, it was highly unlikely that the information would lead to the identification of members of the

DTO, transporters, financiers, distributors, couriers and/or customers.

Therefore, the affidavit explained how these investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or would be too dangerous. As such, the court rejects Defendants' argument that the affidavits supporting the application for Utah Order #1 did not show necessity. Specifically, the court rejects Defendants' argument that the affidavit's discussion failed to show necessity because it was devoid of specifics relating to the case and merely set forth boilerplate language or arguments that could be made in any narcotics trafficking case. As set forth in detail above, the affidavit addressed each specific required investigative technique and related extensive specific details concerning the investigation regarding that specific technique. Although some techniques had not been tried, those sections of the affidavits were as specific as possible to the investigation in explaining why that technique would likely fail to succeed or would be too dangerous.

### b.   Utah Order #2

SA Carrizal also submitted the affidavit supporting the application for Utah Order #2. The affidavit set forth the goal of the investigation to discover the specifics and breadth of the DTO. After establishing probable cause, including information agents had derived from other wire intercepts, the affidavit

explained how investigative techniques other than wiretaps had
not succeeded, were unlikely to succeed, or would be too
dangerous.

### i.   Surveillance

The affidavit set forth the specifics of at least seven
specific instances where surveillance was being conducted.  Most
of these instances yielded little information because
investigators could not hear the content of the conversations
taking place.  A few of the specific instances detailed what
surveillance noted in conjunction with wire intercepts being
received, and how, with that information, surveillance was more
effective.  Even so, the affidavit explained limitations with
surveillance, including that one of the residences was located at
the end of a circle drive, making surveillance without detection
very difficult.  In addition, the affidavit explained that the
residences of Hipolito Lopez and Pedro Lopez did not have the
facilities for the DEA to install pole cameras.  The affidavit
explained that physical surveillance had assisted in confirming
information received through wire intercepts, but that physical
surveillance alone would not establish the elements of the
violations and provide other vital information to prosecute those
involved.  Furthermore, Martinez had recently been arrested,
causing the other targets to be more aware of surveillance.

The court concludes that this information, which includes
many specifics pertaining to this specific information at the

specific time of the wiretap request, provided adequate
information to demonstrate that surveillance without the
assistance of wiretaps had been and would likely continue to be
unsuccessful or would be too dangerous.

### ii.   Questioning and Interrogation of
### Witnesses or Participants

The affidavit supporting the application of Utah Order #2
similarly described the limitations of issuing subpoenas for a
grand jury investigation.  In addition to the information
provided in the first affidavit, the second affidavit explained
that investigators lacked sufficient facts to determine which, if
any, individuals, when compelled to testify before a grand jury,
would reveal the existence of the investigation to Hipolito
Lopez, Vargas, Pedro Lopez, or their associates.

The affidavit also explained how Martinez had been arrested,
but when investigators tried to question him, Martinez
immediately refused to talk without a lawyer.  The affidavit
explained how Pedro Lopez had previously told Martinez not to
talk to the police, and that if Martinez did talk to police, only
general questions could be asked without tipping Martinez off to
the investigation, which he would probably reveal to the other
targets.  As with the first affidavit, the second affidavit also
explained in more general terms why questioning witnesses or
participants would likely be unsuccessful because of their own
culpability, loyalty to the DTO, or fear of reprisal.

Thus, this section of the affidavit explained, using information specific to the investigation, how this investigative technique had been unsuccessful, would likely be unsuccessful, or would be too dangerous.

### iii.   Use of Search Warrants

The affidavit explained that Hipolito Lopez, Pedro Lopez, and Vargas seemed to move the drugs when they knew they had problems with law enforcement.  Therefore, investigators still did not know with certainty where the drugs were being kept.  In addition, the affidavit explained that the use of a search warrant probably would not provide information to determine the full scope of the DTO, the conspiracies involved, the identities of all co-conspirators, and the various methods used to operate the DTO, which were the goals of the investigation.

Thus, by setting forth this information, the affidavit showed, using information specific to the investigation, how this investigative technique would likely be unsuccessful in accomplishing the purpose of the investigation.

### iv.   Infiltration of Conspiratorial Groups by Undercover Agents or Informants

The second affidavit explained that the two CIs discussed in the first affidavit had been used as completely as possible, and the information provided by them was not sufficient to penetrate the DTO or to identify all the DTO's members.  The affidavit also explained that investigators had not been able to develop

76

additional trustworthy CIs who could position themselves to gain knowledge of the DTO's structure, additional suppliers, and distribution outlets.

The affidavit also referenced the undercover agent discussed in the first affidavit and explained that it was unlikely that a new undercover agent with no social ties to the targets would be able to be introduced successfully into the DTO or would be able to gather more information than the CIs had already gathered.

As a result, the second affidavit adequately explained how this investigative technique had not been successful in the past, would unlikely be successful in the future, or would be too dangerous.

### v.  Trap and Trace Devices

The affidavit explained that investigators had, and would continue to use, pen registers, trap and trace devices, and toll record analysis during the investigation, but that these techniques did not establish essential information such as the identities of all the persons called or the content of the conversations.  Thus, the government explained how the use of this technique without wire intercepts would not allow the government to achieve the goals of its investigation.

### vi.  Other Normal Investigative Techniques

The affidavit explained that the DEA was currently in the process of obtaining financial information on Martinez, because he had been arrested and had bankcards in his wallet.  The

affidavit noted that without previous wire intercepts, the agents would not have that information.  The affidavit also set forth at some length specific information obtained supporting the belief that the targets were sending their proceeds to Mexico.  The affidavit therefore explained, using information specific to the case, why a financial investigation would be unsuccessful.

In summary, the court concludes that the affidavit supporting the application for Utah Order #2 explained how these investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or would be too dangerous. The court therefore rejects Defendants' argument that the affidavit supporting the application for Utah Order #2 did not show necessity.  Specifically, the court rejects Defendants' argument that the affidavit's discussion failed to show necessity because it was devoid of specifics relating to the case and merely set forth boilerplate language or arguments that could be made in any narcotics trafficking case.  As set forth in detail above, the affidavit addressed each specific required investigative technique and related extensive specific details concerning the investigation regarding each specific technique discussed.

### 4.  Minimization

Third, Defendants argue that the evidence derived from the Utah wiretaps must be suppressed because the wiretaps were not properly minimized.  As discussed in detail above in the court's

analysis of the California wiretap orders, the court focuses on the reasonableness of the agents' efforts to refrain from monitoring conversations deemed non-pertinent to the investigation in determining whether the government properly minimized calls.  See Scott, 436 U.S. at 139; Willis, 890 F.2d at 1101.  The court evaluates reasonableness based on the facts and circumstances of each case.  See Scott, 436 U.S. at 140; Willis, 890 F.2d at 1101.  "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations."  Scott, 436 U.S. at 140. Furthermore, statistical information may provide the court with assistance in determining reasonableness, but the court must still consider the total facts and circumstances of the case in determining reasonableness rather than relying blindly on percentages of non-pertinent intercepted calls.  See id.

Defendants initially argued that non-pertinent calls had not been properly minimized, that spot-check procedures were not employed by the monitors, and that calls were missing from the government's report.  (File Entry #213, at 4-5; File Entry #215.) However, after receiving more information from the government, Defendants admitted that "the investigators concluded that the minimization line sheets provided by the government did, for nearly all the calls, comport with the mandate that non-pertinent calls be appropriately minimized."  (File Entry #257, at 1.)

Thus, in light of the investigators' findings, Defendants "abandon[ed] [their] arguments that the spot-check minimization procedures were deficient and no longer disput[ed] the 'missing' calls detailed in the initial report." (File Entry #257, at 2.) However, Defendants continued to argue that the government must still demonstrate that the overall minimization efforts were reasonable. The government has sought to meet this burden to demonstrate that its overall minimization efforts were reasonable by providing the court with extensive information detailing its minimization efforts.

First, the government has set forth how monitors were instructed regarding how they were to minimize non-pertinent conversations and were not allowed to engage in monitoring activity without acknowledging receipt of the instructions. A two-minute threshold was established in which a determination should be made regarding the pertinence of a call to the investigation. The monitor was to determine whether a call was pertinent or non-pertinent while the call was being intercepted.

Second, the government has directed the court's attention to facts and circumstances in the case that impact the court's determination of reasonableness. First, this case involves a widespread conspiracy. In such a case, more extensive surveillance is justified to determine the scope of the organization. See Scott, 436 U.S. 140-42. Second, the vast majority of all conversations over both intercepted phone lines

were in Spanish, and even though experienced linguists were monitoring, that factor must be considered.  Third, code words were used by the targets throughout their conversations, requiring the monitors to determine whether a drug deal was being discussed considering the context in which the words were spoken in a very limited time.  Fourth, agents had very limited information at the beginning of the investigation regarding the targets of the investigation and their associates.  Thus, the monitors were required to listen for a longer time to identify the parties involved in the criminal conduct during the investigation.

The government has provided the court with statistical information regarding the calls, and Defendants have not disputed that statistical information.  Therefore, the court relies upon it.  In the five wiretaps at issue here (two wiretaps from Utah Order #1 and three wiretaps from Utah Order #2), 290 calls were two minutes or more in length.  Of these 290 calls, four calls appear to be non-pertinent that were not minimized.  An additional 16 calls of the 290 calls were not minimized that may have been non-pertinent.  Six of those 16 calls were under two minutes and twenty seconds, suggesting that they may have ended before minimization could be activated.  However, even assuming that all sixteen of the calls should have been minimized, the total calls that were non-pertinent and not minimized would be 20 calls out of 290, or 6.8 percent.  Therefore, 93.2 to 98.7

percent of the calls over two minutes were either properly minimized or were pertinent to the investigation.[12]

Having carefully considered the facts and circumstances of this case in light of the statistical information provided to the court by the government, the court concludes that the government's efforts to comply with 18 U.S.C. § 2518(5) in minimizing non-pertinent calls was reasonable.  See Willis, 890 F.2d at 1102; Apodaca, 820 F.2d at 350 n.3.

In conclusion, the court recommends that Defendants' motions to suppress evidence derived from the Utah wiretaps be denied. The Utah wiretap orders were supported by probable cause, necessity was shown, and the monitors' efforts to minimize the non-pertinent calls was reasonable.

## II.   Motion to Suppress Evidence Obtained From Search of Echevarria's Residence and Business

The court next turns to Echevarria's motion to suppress evidence obtained from searches of his residence and business. (File Entry #214.)  Echevarria argues that the affidavits submitted in support of the application for the warrants failed to set forth sufficient facts which would allow a neutral and detached magistrate to conclude that there was probable cause to believe that a controlled substance offense, or any other

---

[12]The government has more recently provided information suggesting that the minimization error rate was lower than the numbers it originally provided to the court suggested.  (File Entry #331.)

offense, was being commited at the locations indicated, or that

contraband or evidence of a crime was located therein.

Echevarria also argues that he is entitled to a <u>Franks</u> hearing

and that the <u>Leon</u> good faith exception does not apply to this

case.

### A.   Probable Cause

"A search warrant must be supported by probable cause,

requiring 'more than mere suspicion but less evidence than is

necessary to convict.'"   <u>United States v. Danhauer</u>, 229 F.3d

1002, 1005-06 (10th Cir. 2000) (quoting <u>United States v. Burns</u>,

624 F.2d 95, 99 (10th Cir. 1980)).   "In determining whether an

affidavit contains sufficient information to support a finding of

probable cause for the issuance of a search warrant, . . . the

issuing judge or magistrate[] must consider the totality of the

circumstances and determine whether the affidavit established the

probability that evidence of criminal activity would be located

in the desired search area."   <u>United States v. Wittgenstein</u>, 163

F.3d 1164, 1171 (10th Cir. 1998), <u>cert. denied</u>, 527 U.S. 1012

(1999).   Reviewing courts afford an issuing magistrate's probable

cause decision great deference; the reviewing court examines only

whether the issuing magistrate had a substantial basis for

concluding that probable cause existed.   <u>See</u> <u>Illinois v. Gates</u>,

462 U.S. 213, 246 (1983); <u>Danhauer</u>, 229 F.3d at 1006; <u>Lawmaster</u>

<u>v. Ward</u>, 125 F.3d 1341, 1348 (10th Cir. 1997)   Thus, an inquiry

into the sufficiency of the probable cause determination is not
to be conducted de novo.

The court has carefully reviewed the affidavits supporting
the application for a warrant to search Echevarria's residence
and business and concludes that the issuing judge had a
substantial basis for determining probable cause existed.  The
affidavit described the background of the case, including the
investigations of the DTO and Echevarria's involvement in the
DTO.  For example, the affidavit described information learned
from wire intercepts that Echevarria was involved in intercepted
communications with Pedro Lopez and Hipolito Lopez, and that many
of the intercepted communications involved the arrangement of
drug transactions and conversations related to the drug
trafficking activity of the DTO.  The affidavit described an
intercepted communication from June 9, 2003, indicating that
Hipolito Lopez was going to deliver drugs to Echevarria at
Echevarria's business.  Agents observed Hipolito Lopez make the
delivery to Echevarria's business on June 10, 2003.  The
affidavit also includes information, based on the affiant's
extensive training and experience, that it is common for
narcotics traffickers to maintain books, records, receipts,
notes, ledgers, and so forth, relating to the transportation,
ordering, sale, and distribution of controlled substances.  The
affidavit also explained, based on the affiant's training and
experience, that such books, records, receipts, and so forth, are

often maintained where the traffickers have ready access to them. The applications for the warrants particularly sought to obtain records relating to the DTO. This information, both that from the affiant's experience and training, and the specific information regarding the DTO being investigated and Echevarria's interaction and participation in the DTO, based on wire intercepts exposing his activities with the DTO, leads this court to conclude that the judge issuing the warrants for Echevarria's residence and business had a sufficient basis for concluding that probable cause supported the applications for the warrants.

Echevarria argues that the information contained in the affidavits was stale because the warrant was not obtained until twenty days after the later wire intercept occurred. "[T]he determination of whether information is stale depends on the nature of the crime and the length of criminal activity, not simply the number of days that have elapsed between the facts relied upon and the issuance of the warrant. Where the offense in question is ongoing and continuing, the passage of time is not of critical importance." United States v. Le, 173 F.3d 1258, 1266-67 (10th Cir. 1999) (citations and internal quotations omitted). This particular case involved the offense of drug trafficking, which the investigation had revealed was continuing and ongoing, making the passage of time of less importance. In addition, the evidence sought in the application was records, which would be kept over time. Therefore, the court concludes

that the issuing judge had a substantial basis upon which to find that the information in the affidavits was not stale.[13]

In summary, the court concludes that the issuing judge had a substantial basis upon which to find that affidavits established probable cause to support the issuance of the warrants for the searches of Echevarria's residence and business.[14]   The court next examines Echevarria's request for a Franks hearing.

### B.   Request for Franks Hearing

The Supreme Court in Franks v. Delaware, 438 U.S. 154 (1978), held that where a defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."   Id. at 155-56.   The Court further held that "[i]n the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by

---

[13]Echevarria also argues that the affidavits did not contain sufficient information to support a no-knock, nighttime search warrant of Echevarria's residence.   Contrary to Echevarria's argument, the search warrant of Echevarria's residence was a knock-and-announce any-time-day-or-night warrant.   (File Entry #233, Attachment B.)   Thus, the warrant was not a no-knock warrant.

[14]Because the court concludes the issuing judge had a sufficient basis upon which to concludes probable cause existed, the court need not address Echevarria's argument regarding the Leon good-faith exception.

86

a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Id. at 156.

Echevarria has alleged that false statements necessary to the finding of probable cause were included in the affidavits supporting the application of the warrants to search his residence and business.  Echevarria thus seeks a Franks hearing.

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Id. at 171.  Furthermore, those allegations "should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient." Id.

Echevarria has identified with specificity the portions of the affidavits he claims are false.  However, these allegations are not accompanied by affidavits or sworn or otherwise reliable

statements of witnesses, nor is the absence of such sworn statements explained.  Instead, the court simply has counsel's assertions that the affiant made false statements, bolstered by counsel's interpretation of the evidence presented.  As such, Echevarria has failed to meet the requirements for a <u>Franks</u> hearing.  As a result, the court denies the <u>Franks</u> hearing request.

### RECOMMENDATION AND ORDER

Based on the foregoing analysis, the court concludes that:

(1)  The affidavits supporting the applications for the California wiretaps showed necessity, and the investigators were reasonable in their efforts to minimize non-pertinent conversations in the California wiretaps.

(2)  The affidavits supporting the applications for the Utah wiretaps showed probable cause; the affidavits supporting the applications for the Utah wiretaps showed necessity; and investigators were reasonable in their efforts to minimize the Utah wiretaps.

(3)  The judge issuing the warrants to search Echevarria's residence and business had a substantial basis for concluding that probable cause existed.

As a result, **IT IS HEREBY RECOMMENDED** that:

(1)  Defendant Carranza's motion to suppress evidence derived from the California wiretaps (**File Entry #258**), which was

88

joined by Defendants Hipolito Lopez, Erenas, and Pedro Lopez (File Entries #268, 279, 281, and 313), be **DENIED;**

(2) Motions to suppress evidence derived from the Utah wiretaps filed by Defendants Hipolito Lopez (**File Entry #107**), Martinez (**File Entry #108**), and Vargas (**File Entry #223**), joined by Ruesga, Pedro Lopez, and Rodriguez (File Entries #245, 313) be **DENIED;** and

(3) Defendant Echevarria's motion to suppress evidence obtained from the searches of his home and business (File Entry #214 ) be **DENIED.**

Furthermore, **IT IS HEREBY ORDERED** that:

(1) Defendant Echevarria's motion for a <u>Franks</u> hearing (File Entry # ) is **DENIED,** and

(2) both Defendant Martinez and the government, in light of this report and recommendation, file memoranda by **May 28, 2005,** discussing their respective positions regarding Defendant Martinez's motion to suppress evidence seized pursuant to the stop and search of the vehicle he was driving on June 24, 2003 (File Entry #11).

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same. The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. § 636(b),

within ten (10) days after receiving it.  Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this ___15th___ day of April, 2005.

BY THE COURT:


Samuel Alba
United States Chief Magistrate Judge

United States District Court
for the
District of Utah
April 15, 2005


\* \* CERTIFICATE OF SERVICE OF CLERK \* \*


Re:  2:03-cr-00476


**True and correct copies of the attached were either mailed, faxed or e-mailed
by the clerk to the following:**

       Benjamin A. Hamilton, Esq.
       356 E 900 S
       SALT LAKE CITY, UT  84111
       EMAIL

       Mr. Edward K. Brass, Esq.
       175 E 400 S STE 400
       SALT LAKE CITY, UT  84111
       EMAIL

       Ms. Deirdre A Gorman, Esq.
       205 26TH ST STE 32
       OGDEN, UT  84401
       EMAIL

       David V. Finlayson, Esq.
       43 E 400 S
       SALT LAKE CITY, UT  84111
       EMAIL

       Scott C. Williams, Esq.
       43 E 400 S
       SALT LAKE CITY, UT  84111
       EMAIL

       Jon D. Williams, Esq.
       8 E BROADWAY STE 500
       SALT LAKE CITY, UT  84111
       EMAIL

       Mr. James I Watts, Esq.
       774 E 2100 S
       SALT LAKE CITY, UT  84106
       EMAIL

       Gregory G. Skordas, Esq.
       SKORDAS CASTON & MORGAN LLC
       9 EXCHANGE PL STE 1104
       BOSTON BLDG
       SALT LAKE CITY, UT  84111

EMAIL

Mr. Mark R Moffat, Esq.
BROWN BRADSHAW & MOFFIT
10 W BROADWAY STE 210
SALT LAKE CITY, UT  84101
JFAX 9,5325298

Mr Richard P Mauro, Esq.
43 E 400 S
SALT LAKE CITY, UT  84111
EMAIL

Mr. Fred Metos, Esq.
10 W BROADWAY STE 650
SALT LAKE CITY, UT  84101
EMAIL

Mr. Stephen R McCaughey, Esq.
10 W BROADWAY STE 650
SALT LAKE CITY, UT  84101
EMAIL

Kerry L. Steigerwalt, Esq.
KERRY L. STEIGERWALT & ASSOC
3555 4TH AVE
SAN DIEGO, CA  92103
EMAIL

Carlos A. Garcia, Esq.
UTAH FEDERAL DEFENDER OFFICE
46 W BROADWAY STE 110
SALT LAKE CITY, UT  84101
EMAIL

Todd A. Utzinger, Esq.
UTZINGER & PERRETTA
562 S MAIN ST 2ND FL
BOUNTIFUL, UT  84010
EMAIL

US Probation
DISTRICT OF UTAH
,
EMAIL

United States Marshal Service
DISTRICT OF UTAH
,
EMAIL

Mr. Bradley P Rich, Esq.
YENGICH RICH & XAIZ
175 E 400 S STE 400
SALT LAKE CITY, UT  84111
EMAIL

Michael P. Kennedy, Esq.
US ATTORNEY'S OFFICE
,

**EMAIL**